UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

Tracy Lewis in her capacity of     *     CIVIL ACTION NO. 13-777
Natural Tutrix and on behalf       *
of her minor child E.E.
(heir to Ervin Edwards)          *     JUDGE SHELLY D. DICK

v.
SHERIFF MIKE CAZES         *
(Individually and in His Official    *
Capacity as Sheriff of
West Baton Rouge Parish),      *
Deputies X, Y and Z          *     MAGISTRATE JUDGE
(Individually and in their        *     STEPHEN C. RIEDLINGER
Official Capacities as Deputies    *
for the Sheriff of West Baton Rouge)  *
and ABC Insurers
*******************************************************

**AMENDED COMPLAINT**

This action arises under the United States Constitution. Specifically, the action arises under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment, and is brought pursuant to 42 U.S.C. §§ 1983 *et seq*. and 1988, which establish a federal court remedy for constitutional violations. The action also arises under the Louisiana State Constitution, specifically Articles I §§ 2 and 5. The action is also brought under the general tort principles set forth in the Louisiana Civil Code, including, without limitation, Articles 2315 and 2320 and common law tort principles adopted by Louisiana courts.

**STATEMENT OF JURISDICTION**

1.

Jurisdiction is conferred upon this court by the provisions of 28 U.S.C. 1343(3), the jurisdictional counterpart of 42 U.S.C. 1983, and 28 U.S.C. 1331. Supplemental jurisdiction is conferred upon this court over the state law claims pursuant to 28 U.S.C. 1367(a).

2.

**PARTIES**

Plaintiff:

TRACY LEWIS is an individual of full age and majority who resides in the parish of Jefferson Davis, State of Louisiana. E.E. is the natural minor child of Tracy Lewis and the decedent Ervin Edwards, who resides in the parish of Jefferson Davis, State of Louisiana, with Tracy Lewis (his mother/natural tutrix).

3.

The defendants are:

**DUSTIN MCMULLAN** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as officer for the Port Allen Police Department in West Baton Rouge.

**CASEY WILLIAMS** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as officer for the Port Allen Police Department in West Baton Rouge. Office.

ABC Insurers [hereinafter ABC] is an insurance company(s) authorized to do and doing business in the State of Louisiana.

**WILLIAM ALEANDER** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as deputy for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

**COREY HICKS** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as deputy for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

**ANDY LEBLANC** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as deputy for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

**RANDY AUSTIN** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as deputy for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

**BEN ARCENEAUX** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as deputy for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

**THOMAS SCHIRO** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as deputy for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

**NURSE LEAH STEIN GRANIER** is an individual of full age and majority, believed to be domiciled in the parish of West Baton Rouge and at all relevant times herein, was acting and serving in his capacity as nurse for the West Baton Rouge Parish Sheriff's Office located at the jail in Port Allen Police in West Baton Rouge Parish.

4.

Defendant OFFICERS and DEPUTIES are sued in their individual capacities.

5.

At all times relevant herein, defendant OFFICERS and DEPUTIES and the Nurse, acted under the color of the laws, statues, ordinances, regulations, policies,

3

customs and usages of the State of Louisiana.

6.

On or about November 26, 2013, Ervin Edwards [hereinafter ["EDWARDS"], accompanied by Tori Paddio [hereinafter "PADDIO"] and George Lowdins [hereinafter "LOWDINS"], stopped at a Chevron gas station in Port Allen Louisiana in order to get gasoline for his (EDWARDS') vehicle.

7.

Upon arrival at the Chevron station, while inside the convenient store, EDWARDS and PADDIO got into a minor argument.

8.

The clerk took it upon herself to call the West Baton Rouge Sheriffs Department [hereinafter "WBRSD"] out to the Chevron station.

9.

When DEPUTIES for WBRSD arrived at the Chevron station, the argument between EDWARDS and PADDIO had ceased.

10.

Notwithstanding the fact that the argument between EDWARDS and PADDIO had ceased, DEPUTIES confronted EDWARDS and PADDIO and proceeded to question EDWARDS regarding what he perceived to be "sagging" pants.

11.

EDWARDS responded to their inquiry by saying, "Don't worry about my pants." EDWARDS then walked approximately 4 feet away and leaned against his (EDWARDS') vehicle, at which time OFFICER DEFENDANT -- without verbally declaring that EDWARDS was being placed under arrest, nor providing him (EDWARDS) with the reason he was being placed under arrest — proceeded to grab EDWARDS by the arm, stating to him (EDWARDS), "You're going to jail!"

4

12.

EDWARDS then jerked away from X and queried, "Why am I going to jail? I didn't do anything."

13.

Upon seeing EDWARDS jerk away from X, OFFICER DEFENDANT [hereinafter "Y"] grabbed EDWARDS by the other arm, ordering him to "get on the ground, or we're going to tase you!"

14.

Upon hearing OFFICER DEFENDANTS threaten to tase EDWARDS, PADDIO became very alarmed while hysterically exclaiming, "NO! NO!, YOU CAN'T TASE HIM! HE HAS HIGH BLOOD PRESSURE!"

15.

OFFICER DEFENDANTS again tell EDWARDS to "get on the ground or we 're going to tase you and pepper spray you." EDWARDS, with some measure of difficulty due to his size (300 plus pounds), then complied with OFFICER DEFENDANTS verbal command to get on the ground by kneeling on his right knee with his left leg in front of him.

12.

After getting OFFICER DEFENDANTS attention through the above-referenced exclamations in paragraph 14, PADDIO proceeded to advise OFFICER DEFENDANTS of other fragile medical issues that confronted EDWARDS, such as a plate in his (EDWARDS') shoulder, a plate in his (EDWARDS') jaw, and hearing loss in his left ear.

13.

Once again EDWARDS, using profanity, asked, "Why am I going to jail? I didn't do anything."

14.

5

OFFICER DEFENDANTS, while completely ignoring EDWARDS' legitimate question regarding their decision to take him (EDWARDS) to jail, eventually managed to handcuff EDWARDS' hands behind his (EDWARDS') back using three handcuffs.

15.

OFFICER DEFENDANTS then proceed to force EDWARDS to lay face down in a supine position on the ground.

16.

After forcing EDWARDS into the above-referenced position described in paragraph 18, OFFICERS DEFENDANT immediately placed his knee in EDWARDS' back while simultaneously forcing his (EDWARDS') face to the concrete ground.

17.

While OFFICERS were on top of EDWARDS, OFFICER DEFENDANT went to one of the vehicles and retrieved several plastic restraining ties.

18.

While EDWARDS was laying face down on the ground, three additional OFFICERS arrived at the Chevron station.

19.

DEFENDANT OFFICER subsequently handed the restraining ties to OFFICER DEFENDANT, who in turn, shackled EDWARDS' feet while he (EDWARDS) continued to lay face down on the ground.

24.

Thereafter, DEFENDANT OFFICERS began to search EDWARDS' person, including his pockets asking EDWARDS, "Do you have drugs or any weapons?" There were no drugs, weapons or illegal contraband found on EDWARDS pursuant to OFFICERS' thorough search of his (EDWARDS') person.

20.

6

EDWARDS, in a heightened state of agitation, once again asked OFFICERS, "Why am I going to jail? I didn't do anything."

21.

While EDWARDS lay face down on the ground, OFFICERS began to discuss how they were going to get EDWARDS off of the ground.

22.

DEFENDANT OFFICERS eventually managed to get EDWARDS into a standing position, at which point EDWARDS' pants fell down to the ground.

23.

Instead of focusing their efforts on pulling EDWARDS' pants back up, DEFENDANT OFFICERS attempted to take EDWARDS pants completely off, without having any regard for: (1) the fact that they had previously shackled his feet with plastic restraining ties; nor (2) the public embarrassment and humiliation that they were subjecting EDWARDS to in their crude and callous attempts to take his (EDWARDS') pants off in a heavily trafficked public area.

28.

At no time herein stated was EDWARDS ever informed or advised that: (1) that he was being placed under arrest; nor (2) the reason/basis for his (EDWARDS') arrest.

24.

OFFICERS subsequently placed EDWARDS in the back of a law enforcement vehicle and transported him to the West Baton Rouge Parish Jail [hereinafter "JAIL".

25.

PADDIO followed OFFICERS who were transporting EDWARDS to the JAIL.

26.

EDWARDS was tased during transport or at the time he arrived at the JAIL and while in custody of DEFENDANT OFFICERS.

7

27.

DEFENDANT OFFICERS had already been informed of the serious health issues and asked not to tase, but they callously disregarded the serious nature of the threat.

28.

Upon arrival at the JAIL, PADDIO observed EDWARDS being escorted into the back of the facility without offering any resistance to DEPUTY escorts at all.

29.

PADDIO then proceeded to the front of the facility in order to inquire about the details of EDWARDS' bonding requirements.

30.

While in the station, OFFICERS handed PADDIO EDWARDS' cell phone, which PADDIO subsequently used to call VONNIE EDWARDS (EDWARDS' mother) [hereinafter "EDWARDS' MOTHER"], to inform her ("EDWARDS' MOTHER") of her son's (EDWARDS') arrest.

31.

During the course of PADDIO's conversation with EDWARDS' MOTHER, PADDIO pauses to hand the cell phone to DEPUTY Z.

32.

EDWARDS' MOTHER implored DEPUTY Z not to tase her son (EDWARDS) because he suffered with high blood pressure and other medical issues, including the fact that he (EDWARDS) had been diagnosed with schizophrenia, and that he sustained an injury that resulted in loss of hearing in his left ear, which is ultimately attributable to his (EDWARDS') loud manner of speech.

33.

DEFENDANT OFFICER Z was heard by PADDIO to have responded to

8

EDWARDS' MOTHER by saying, "his girlfriend told us that already."

34.

After an approximately three to five minute conversation, DEPUTY Z then told PADDIO to go and retrieve EDWARDS' blood pressure medication out of her vehicle.

35.

As PADDIO was going to retrieve the blood pressure medication, she noticed two red and white colored rescue vehicles pulling up into the JAIL with their visual indicators flashing.

36.

After retrieving the blood pressure medication, contained within a black book-sack, PADDIO walked back inside of the Sheriff's station.

37.

Immediately upon re-entry into the Sheriffs station, PADDIO asked DEPUTY Z, "Is EDWARDS 0.K because I just saw two rescue units pull up?"

38.

DEPUTY Z responded by saying, "That (referring to the rescue units) could be for anybody. This is a jail".

39.

PADDIO then went inside of the black book-sack, retrieved EDWARDS' blood pressure medication and handed it to DEPUTY Z.

40.

DEPUTY Z, after taking the blood pressure medication from PADDIO, leaves her (PADDIO' s) presence and walks out of the room towards the back of the JAIL.

41.

EDWARDS' MOTHER then calls on EDWARDS' cell phone and questions PADDIO regarding the nature of EDWARDS' charges and the bond. PADDIO, in turn,

posed the aforementioned questions to an UNIDENTIFIED DEPUTY.

42.

UNIDENTIFIED DEPUTY responded by saying that EDWARDS was being held for two misdemeanor offenses: (a) resisting arrest; and (b) disturbing the peace. 43.

44.

In the meantime, the DEFENDANT OFFICERS had used tasers and other force on EDWARDS which force was unnecessary and excessive and/or corporal punishment in violation of law and which caused or contributed to his death.

45.

Minutes later, two UNIDENTIFIED OFFICERS/detectives approached PADDIO and asked her to step into a room for questioning, wherein these UNIDENTIFIED OFFICERS asked PADDIO on three separate occasions, "Do you feel like we were too rough in handling EDWARDS," as if they (OFFICERS) were seeking to be exonerated in advance for killing EDWARDS.

46.

This caused PADDIO to become hysterical and exclaim, "Is he (EDWARDS) alright?" OFFICERS responded by saying that they could not tell PADDIO anything because she (PADDIO) was only the girlfriend.

47.

PADDIO, being told that OFFICERS could not disclose information regarding EDWARDS' condition to her (PADDIO) as the girlfriend, was overcome with a distinct feeling that something had gone tragically wrong. PADDIO then leaves the Sheriff's station to head to Jennings, Louisiana.

48.

Shortly after leaving the Sheriffs station/JAIL, PADDIO used LOWDINS' cell

phone to call EDWARDS' MOTHER'S home to discuss matters relating to EDWARDS' bond. EDWARDS' brother got on the phone and told PADDIO that EDWARDS was dead. PADDIO immediately called the WBRSD and it was confirmed that EDWARDS was, in fact dead.

49.

While in custody, EDWARDS was placed in cell for booking/bond and placed on the floor and/or due to his medical condition he was not able to stand.  His medical condition at that time is unknown.

50.

For reasons unknown, all Defendants save the nurse moved/dragged EDWARDS to a holding cell while he was in restraints.

51.

EDWARDS had not resisted any order and was cooperating fully when he was dragged to a holding cell.

52.

Without providing an opportunity to EDWARDS to assist with the removal of restraints, he was thrown to the floor on his stomach while cuffed behind his back causing positional asphyxiation or difficulty breathing.

53.

Defendants did then pile on him and on his back and used force to remove the restraints.

54.

No force was necessary or shown to be necessary; yet, force was being applied by the entire group of Defendants.

55.

There was no resistance offered by EDWARDS who was tazed during this time

and he may have already been dead prior to the time that the cuffs were removed.

56.

As EDWARDS lay lifeless on the floor all Defendants exited.

57.

The nurse Defendant then well aware of a serious medical condition came to the cell and would not take action to perform CPR or take any measure.  Such actions are in a callous disregard for a serious medical condition.  By the time the EMS arrived, it was well too late to resuscitate EDWARDS.

58.

STATEMENT OF CLAIMS

Plaintiff, LEWIS, is the mother of E.E., and EDWARDS is EE'S father. As the surviving parent of the EE, LEWIS qualifies under Article 4061.1(A) to act of right as tutor. She is, therefore, the proper party to file suit on behalf of her minor child.

59.

EE is the sole surviving heir of EDWARDS who has the right to bring this action pursuant to Article 2315.1 in order to recover damages for the injuries sustained by EDWARDS.

60.

EE is the sole surviving heir of EDWARDS who has the right to bring this action pursuant to Article 2315.2 in order to recover the injuries sustained by him (EE) personally for the death of EDWARDS and the corresponding loss of support, loss of society, care, grief, and love and affection, as well as for funeral expenses.

61.

Defendants are jointly and solidarily liable to plaintiff s for each of the following reasons:

62.

12

CLAIMS AGAINST OFFICERS

COUNT I

Fourth Amendment Violation: Unlawful use of Deadly Force

Plaintiff incorporates Paragraphs 1 — 54 by reference as though fully set forth herein.

63.

As a direct and proximate result of the above referenced unlawful, excessive, unwarranted, unprovoked and deadly force used upon EDWARDS by OFFICERS, committed under color of law and while using the badge of their authority as an WBRSD OFFICERS, EDWARDS suffered grievous bodily harm, including death, and was deprived of his clearly established constitutional right to be secure in his person against unreasonable seizure of his person under the Fourth and Fourteenth Amendments to the United States Constitution.

64.

OFFICERS could not have reasonably believed that the aforementioned deadly force was consistent with EDWARDS' clearly established Fourth Amendment rights to be secure in his person against unreasonable seizure of his person, because inter alia: (1) no probable cause or even reasonable suspicion existed to believe that EDWARDS posed a threat of physical harm to OFFICERS or anyone else; (2) no probable cause existed to believe that EDWARDS had committed or was about to commit any crime; (3) and because no reasonable law enforcement police officer could have reasonably believed that the use of deadly force, or indeed the use of any force whatsoever, under the non-threatening circumstances facing OFFICERS, was consistent with EDWARDS' clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures.

65.

COUNT II

Fourth Amendment Violation: Unlawful Arrest

Plaintiffs incorporate Paragraphs 1 - 58 by reference as though fully set forth herein.

66.

Aside from the unlawful, excessive, unwarranted, unprovoked and deadly physical force visited upon EDWARDS by OFFICERS, OFFICERS also deprived EDWARDS--under color of law and while using the badge of their authority as WBRSD OFFICERS—of his (EDWARDS') clearly established right to be secure in his person against unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution by virtue of an

unlawful and false arrest.

67.

It has been clearly established that an application of physical force by an officer is considered a seizure for Fourth Amendment purposes. Accordingly,  OFFICERS subjected EDWARDS to an unlawful seizure by arresting him (EDWARDS) without informing him (EDWARDS) that he was being placed under arrest and without telling him (EDWARDS) the reason he was being arrested.

68.

No reasonable law enforcement officer in OFFICERS' position could have reasonably believed in the existence of probable cause or even in the existence of reasonable suspicion that EDWARDS had committed any crime whatsoever, or that the seizure was consistent with EDWARDS' clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures.

69.

14

As a direct and proximate result of the above referenced unlawful, excessive, unwarranted, unprovoked and deadly force used upon EDWARDS by OFFICERS, committed under color of law and while using the badge of their authority as an WBRSD OFFICERS, EDWARDS suffered grievous bodily harm, was deprived of his clearly established right to be secure in his person against unreasonable seizure of his person under the Fourth and Fourteenth Amendments to the United States Constitution.

70.

COUNT III

Substantive Due Process Violation

Plaintiffs incorporate Paragraphs 1 - 62 by reference as though fully set forth herein.

71.

As a direct and proximate result of the above referenced unlawful, excessive, unwarranted, unprovoked and malicious tasing of EDWARDS by OFFICERS, committed under color of law and while using the badge of their authority as an WBRSD OFFICERS, EDWARDS suffered grievous bodily harm and was deprived of his clearly established rights to be free from arbitrarily, oppressively, and egregiously exercised government power under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

72.

Specifically, and without limitation, defendants OFFICERS', use of deadly force upon EDWARDS—an unarmed individual - amounts to an abhorrent abuse of power which shocks the conscience, violates decencies of civilized conduct, and interferes with rights implicit in the concept of an ordered society.

73.

15

Defendants OFFICERS could not have reasonably believed that the aforementioned deadly force and conscience-shocking conduct was consistent with EDWARDS' clearly established Due Process right to be free of arbitrary and oppressive exercises of government power, because inter alia: (1) no probable cause existed to believe that EDWARDS posed a threat of physical harm to the officers or anyone else; (2) no probable cause or reasonable suspicion existed to believe that EDWARDS had committed or was about to commit any other type of crime; (3) and because no reasonable law enforcement police officer could have reasonably believed that the use of deadly force, or indeed the use of any force whatsoever, under the non-threatening circumstances facing the defendants, was consistent with EDWARDS' clearly established Due Process right to be free of arbitrary and oppressive exercises of government power.

74.

COUNT IV.

Violations of Article I § 5 of the Louisiana State Constitution

Plaintiffs incorporate Paragraphs 1 - 66 by reference as though fully set forth herein.

75.

Article I § 5 of the Louisiana State Constitution establishes the rights of Louisiana's citizens to be "...secure in his person, property, communication, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy..." LSA Const. Art. I § 5. The Article creates affirmative rights beyond the domain of criminal procedure, and creates a cause of action directly under the Louisiana State Constitution.

76.

For each of the reasons set forth above, which are adopted herein by reference,

16

Defendants OFFICERS also violated plaintiffs' clearly established rights protected by Article I § 5 of the Louisiana Constitution.

77.

Specifically OFFICERS violated EDWARDS' clearly established state constitutional rights under Article I § 5 of the Louisiana Constitution to be free from unreasonable seizures.

78.

Defendants OFFICERS are not entitled to qualified immunity on any of the foregoing state constitutional violations because--for the reasons set forth above--no reasonable officer could have believed that the unlawful use of deadly force, and violence was consistent with EDWARDS' rights as secured by the Louisiana Constitution, including, without limitation, those rights secured by Article I § 5.

79.

COUNT V.

DELIBERATE INDIFFERNCE TO A SERIOUS MEDICAL CONDITOIN

80.

Plaintiffs incorporate Paragraphs 1 - 71 by reference as though fully set forth herein.

81.

At each step the Defendants were warned of the medical condition of the EDWARDS yet they continued to taze him and when he collapsed he was left for dead and ignored.

82.

When he showed physical weakness and loss of virility he was drug out of his cell and brought into a holding cell and further harassed until he was motionless and he was left.

17

83.

The nurse came in and took no action to resuscitate or otherwise address the serious medical conditoin while there was still a chance he could be resusciatated.

84.

Such conduct is creul and unusual punishment to a detainee and violates the 4th and 14th Amendment rights of Edwards and caused his death.

COUNT VI.

Violations of Article I § 2 of the Louisiana State Constitution

85.

Plaintiffs incorporate Paragraphs 1 - 71 by reference as though fully set forth herein.

86.

For each of the reasons set forth above, which are adopted herein by reference, the outrageous conduct of defendants OFFICERS has also violated EDWARDS' clearly established rights protected by Article I § 2 of the Louisiana State Constitution, which provides that: "No person shall be deprived of life, liberty, or property, except by due process of law." LSA-Const. Art. 1, § 2.

87.

OFFICERS are not entitled to qualified immunity on any of the foregoing violation of Article I § 2 of the Louisiana State Constitution because--for the reasons set forth above--no reasonable officer could have believed that the unlawful use of deadly force and violence was consistent with EDWARDS' rights as secured by the Louisiana Constitution, including, without limitation, those rights secured by Article I § 2.

88.

COUNT VII.

NEGLIGENCE

18

Defendants OFFICERS' conduct as set forth above was reckless, extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized society and/or negligent in fact pursuant to La. C.C. art. 2315, et seq.

89.

## WRONGFUL DEATH AND SURVIVAL ACTION

Defendant(s) is liable to Plaintiff pursuant to La. C.C. 2315.1 and 2315.2 through 42 USC § 1983.

As a result of the foregoing, EDWARDS was caused to sustain severe injuries, including multiple taser wounds and, on reasonable belief, multiple blows to the head (head trauma) and other physical injuries/trauma to his body. Further, as a result of the above-described incident, EDWARDS has been caused to suffer severe physical pain and severe mental anguish.

90.

Further as a result of the foregoing, EE has suffered a lifetime loss of general support, loss of economic support, loss of emotional support, loss of psychological support, loss of parental guidance, loss of parental instruction, loss of educational support, loss of society, care, love and affection.

91.

## DEMAND FOR TRIAL BY JURY:

Plaintiff hereby demands a trial by jury.

92.

## DEMAND FOR PUNITIVE DAMAGES

Plaintiff, LEWIS, on behalf of her minor child EE, is entitled to an award of punitive damages against each of the defendants sued in their individual capacities, for their knowing, intentional, malicious acts and omissions, or in the alternative, for their outrageous and reckless disregard of, and indifference to, the rights of EDWARDS.

19

93.

DEMAND FOR ATTORNEY'S FEES AND COSTS:

Plaintiff, LEWIS, on behalf of her minor child EE, is entitled to an award of all costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1981. Plaintiffs seek relief in the form of attorney's fees and cost pursuant to 42 USC § 1988 and punitive damages pursuant to 28 USC § 1983 and the 28 USC § 2671 et seq. or any other applicable statute.

94.

DEMAND FOR JUDGMENT

WHEREFORE, plaintiff, LEWIS on behalf of her minor child EE, prays for an award of compensatory damages against each defendant jointly and solidarily, for EDWARDS' personal injury, pain and suffering, emotional distress, loss of enjoyment of life.

95.

An award of compensatory damages against each defendant jointly and solidarily, for the death of EDWARDS and the corresponding loss of support, loss of society, care, and affection, and grief as well as for funeral expenses.

96.

An award of punitive damages against each of the defendants sued in their individual capacities, for their knowing, intentional, malicious acts and omissions, or in the alternative, for their outrageous and reckless disregard of, and indifference to, the rights of EDWARDS.

97.

An award of all costs of this action, against each defendant jointly and solidarily, including reasonable attorney's fees.

98.

20

For all other equitable and general relief.

WHEREFORE, Plaintiffs pray that the Defendants be cited to appear and answer and that after resolution of this matter that this Honorable Court enter Judgment in favor of the Plaintiffs against the defendants with legal interest from the date of demand as follows:

a.    Physical pain and suffering;

b.    Physical injuries;

c.    Loss of consortium;

d.    All costs associated with burial and funeral;

e.    All lost wages;

f.    For emotional and mental distress, pain and suffering, humiliation, embarrassment and loss of employment opportunities;

g.    All Medical and pharmaceutical bills and services;

h.    All litigation expenses;

i.    For attorneys fees and for costs as may be allowable by law;

j.    For such other relief that the Court may deem just, equitable, or proper.

Respectfully submitted:
s/ Donna u. Grodner
Donna U. Grodner (20840)
Blake S. Leger (32251)
GRODNER & ASSOCIATES
2223 Quail Run, B-1
Baton Rouge, Louisiana 70808
(225) 769-1919
FAX (225) 769-1997

Elton Heron # 28077
Attorney at Law
37218 Audubon Park Avenue
Geismar, LA 70732
(504) 723-8782 Fax (225) 673-4095
heron.elton@gmail.com

**Joel G. Porter (21825)**
**Attorney at Law**
**1208 Julia Street**

Baton Rouge, La 70802
(225)978-1955 Fax: 456-2886

## CERTIFICATE

I hereby certify that on June 26, 2014, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to counsel named below by operation of the court's electronic filing system.  I also certify that I have mailed by United States Postal Service this filing to the parties marked non-CM/ECF participants:

s/**Donna U. Grodner**
_____       **Donna U. Grodner (20840)**
**GRODNER & ASSOCIATES**
**2223 Quail Run, B-1**
**Baton Rouge, Louisiana 70808**
**(225) 769-1919 FAX 769-1997**
**Email:dgrodner@grodnerlaw.com**

22