UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TRACEY LEWIS, IN HER CAPACITY                  CIVIL ACTION
AS NATURAL TUTRIX AND ON
BEHALF OF HER MINOR CHILD, E.E.                NO. 13-777-JWD-SCR
(HEIR TO ERVIN EDWARDS)
                                               JUDGE: JOHN W. deGRAVELLES

v.                                             MAGISTRATE JUDGE: STEPHEN
                                               C. RIEDLINGER

SHERIFF MIKE CAZES, ET AL

## DECLARATION OF DUSTIN MCMULLAN

1.    My name is **DUSTIN MCMULLAN**.

2.    On November 26, 2013 I was an officer for the Port Allen Police Department.

3.    Attached as Exhibit A-1 is my Incident Report (Complaint # 13-002235) containing my factual investigation of the events that transpired on November 26, 2013 involving Ervin Leon Edwards.

4.    I personally observed and, thereafter, wrote the attached Incident Report (Complaint # 13-002235) pursuant to a legally authorized investigation and as an officer of the law for the City of Port Allen.

5.    All facts and information contained within my Incident Report (Complaint # 13-002235) are true and correct to the best of my recollection at the time I wrote the report. However, I was mistaken in my belief (as indicated in my report) that I re-holstered my Taser X26 right after it was employed for one 5 second cycle. Even though my Taser X26 was not immediately re-holstered, I never activated again my Taser X26 after that initial attempt to get Edwards to comply.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

Executed on this 30th day of April, 2015.

                                               _____
                                               DUSTIN MCMULLAN

EXHIBIT
A

5648913_1.docx

# Port Allen Police Department
## Incident Report
Complaint #: 13-002235

Incident Seq #: 1



## Supplementals

| Supplemental No: | 1 | | |
|---|---|---|---|
| Reporting Officer: | Dustin McMullan | Reporting Date: | 11/26/2013 |
| Reviewing Officer: | Ronald Kauffman Jr. | Review Date: | 12/5/2013 |

**Narrative:**

On 11/26/2013 at approximately 17:56 hours I, Officer McMullan was on patrol at the intersection of Allendale and Court Street. While at this location, I heard West Baton Rouge Dispatch give a call for service in reference to a possible fight at the Chevron gas station at (111 Lobdell Hwy). I then heard Deputies B. Arceneaux (WBR-31) and R. Austin (WBR-36) advise that they were on scene. Shortly after I heard the Deputies call on scene, Deputy B. Arceneaux (WBR-31) requested assistance from any available officer in detaining the suspect who was later identified as (Ervin Leon Edwards) by bringing some ankle restraints to their location. At that point I went en route to assist the Deputies with detaining the suspect due to the fact that I was only a few blocks from their location.

Immediately upon my arrival, I was able to observe Deputy B. Arceneaux (WBR-31), Deputy R. Austin (WBR-36), and Major Andy LeBlanc attempting to restrain a very large black male adult suspect (Ervin Leon Edwards) using empty hand control techniques. The Deputies were attempting to place "Plastic ZIP Ties" around (Edwards) ankles to prevent him from kicking them. I also noticed that "Edwards" did have several sets of handcuffs already placed on him with his hands behind his back. However, the suspect was still resisting arrest by kicking at the deputies and attempting to push them off him. At that point I began aiding them in placing the "Plastic ZIP Ties" around his ankles. After securing his ankles with the plastic zip ties we checked the handcuffs on Edwards to ensure they were not to tight. We then loosened the handcuffs and repositioned Edward's wrist to a better position so that the handcuffs would not restrict any circulation. At that time Deputies were able to identify the suspect as Ervin Leon Edwards (D.O.B. 07/07/1975). Edwards was still combative at this point trying to get up off the ground and kick at Deputy Austin (WBR-36). Edwards was also making threats against all Law Enforcement personnel stating that he was going to "kill" us.

At this point I requested Officer C. Williams (PA-3) to our scene per the request of Deputy B. Arceneaux (WBR-31). Officer C. Williams (PA-3) was requested due to the fact that he was driving a Ford Crown Victoria which was lower to the ground enabling us more safely and easily secure Edwards in a patrol vehicle. Once Officer C. Williams (PA-3) arrived on scene we stood Edwards up and asked him to walk to Officer C. Williams (PA-3) Patrol car but Edwards refused. At this time Deputy Austin (WBR-36) and myself escorted Edwards to the patrol car by utilizing the police assisted carrying method placing our arms underneath Edwards shoulders to support his weight. Using this method we were able to get Edwards to the patrol car and place him inside. Edwards then laid down in the car refusing to sit up which prevented us from being able to place a seatbelt around him to properly secure him. Once inside the patrol unit Edwards began to get more aggressive by spitting at the windows and making more verbal threats towards all officers stating that he would kill us when he gets free. Edwards also began hitting his head against the patrol units door window.

Officer C. Williams (PA-3) then went enroute to the West Baton Rouge Detention Center to transport Edwards to their custody. Edwards was being very loud and verbally aggressive towards Officer C. Williams (PA-3) so due to this, I advised West Baton Rouge dispatch that Officer C. Williams (PA-3) was enroute to the Detention center with Edwards and that I would be following him. While enroute to the detention center Officer C. Williams (PA-3) and I traveled at a speed of only 35 "MPH" in order to more safely transport Edwards due to not being able to seatbelt him.

# Port Allen Police Department

## Incident Report

Complaint #: 13-002235

Incident Seq #: 1

Once we arrived at the Detention Center with Edwards we were met by Sergeant Hicks and Corporal Alexander in an attempt to remove Edwards from the patrol unit. I asked Edwards to exit the patrol car but he refused to cooperate. I asked Edwards again to exit the patrol car and he again refused so we were forced to pull him out of the unit. We were then able to carry Edwards inside the jail by utilizing the same method that we used to get him in to the patrol car. Once we got Edwards inside the jail he continued being verbally aggressive as well as attempting to pull away from us while continuing to make the same verbal threats of wanting to "KILL" all the officers involved. At that point Sergeant Hicks advised Corporal Alexander and myself to place Edwards inside the holding cell so we did. Once inside the holding cell Edwards began walking around and leaning against the door of the holding cell all the while still being verbally aggressive. Sergeant Hicks then asked Corporal Alexander to transfer Edwards to an Isolation cell to better secure Edwards in an attempt to prevent him from harming himself or causing himself any injury.

We then began carrying Edwards to the Isolation cell using the above mention method of carry again due to Edwards refusal to cooperate. Once we reached the Isolation cell Edwards refused to enter by dropping to the ground using all his weight. I immediately asked Edwards to stand up and walk into the cell but he refused to cooperate. At that time we grabbed Edwards by his arms and slid him into the Isolation cell. Once inside the cell we attempted to remove all restraints from Edwards. While attempting to remove the restraints, Edwards got even more combative than he had previously been. He began kicking and growling while and trying to get up off the ground. Edwards continuously attempted to pull his hands away from all officers who were attempting to restrain him so that we could remove the handcuffs. Using empty hand control techniques, we were finally able to remove the handcuffs from Edwards. Once his hands were free of the handcuffs, he began trying to place his hands under his body on the ground in an attempt to get up. At that point I grabbed Edward's left wrist and was able to get it back behind his back. We then began attempting to remove the "Zip ties" that were restraining Edwards ankles but had to stop because he began kicking very heavily. At this point I advised Edwards that I was going to have to use my Taser on him if he did not calm down and stop fighting against us. Edwards ignored my instructions and continued fighting us. I then advised Edwards twice more for a total of three times of my intention to utilize the Taser in an attempt to get pain compliance reaction. Edwards again ignored me. So at that time due to the number of officers holding Edwards I decided to use the "Drive Stun" technique so that no officer restraining Edwards would be effected by accidentally making contact with the loose wiring of the Taser lead's which could cause them to lose hold of Edwards. I then removed my Taser X26 (Serial #X00-232544) from my holster and removed the front cartridge containing the prongs and lead's and handed it to another jailer who was not able to assist in restraining Edwards due to the limited amount of space inside the Isolation cell.

I then deployed my Taser placing it on the upper rear portion of Edwards right side (Gluteus Maximus muscle) in an attempt to locate the area of his body which had the largest amount of muscle mass. This was done in an attempt to allow the Taser the best chance of success by allowing the Taser's current to reach muscle to ensure a successful deployment. I then pulled the trigger on the Taser using the full five second cycle on Edwards. However, the Taser did not appear to have any effect on Edwards. Due to the obvious lack of effect of the Taser, I then re-holstered it. I then again assisted in restraining Edwards using empty hand control techniques. We were then able to finally remove all restraints from Edwards and exit the cell. After exiting the cell Sergeant Hicks looked at Edwards to verify that he was ok. Sergeant Hicks was able to observe Edwards breathing and moving his arms so we secured the cell door.

After securing the cell door all Officers cleared the area. However, as I was about to leave the Detention Center I noticed that Corporal Alexander was motioning for me to come back to his location. Once I walked over to Corporal Alexander's location he asked me to help him check on Edwards because had stopped responding to Corporal Alexander's commands. I then entered the cell where Edwards was and saw that he was laying on his stomach and seemed unresponsive. Corporal Alexander and myself then rolled Edwards over onto his back to check and see if he was awake. Edwards no longer seemed to be conscious so I then attempted to locate a Brachial pulse at Edwards neck. I was unable to locate one

# Port Allen Police Department

## Incident Report

### Complaint #: 13-002235

### Incident Seq #: 1

at that location so I then checked for a pulse at his wrist area. Again I was unable to locate a pulse and advised Corporal Alexander to get the on scene nurse (Leah Steins) to come to our location. Steins then entered the cell and attempted to locate a pulse on Edwards but was also unable to detect one. I then performed a sternum rub on Edwards chest three times and was still unable to get a response. I also checked his eyes to see if there was any kind of pupil response. Again there was not response.

At that time Sergeant Hicks notified Dispatch telling them the "CPR" was being administered and asked them to get Rescue and Acadian to our scene. Steins and I then began using the Automated Heart Defibulator (AED) in an attempt to revive Edwards. After connecting the lead's to the upper right side portion of Edwards chest and the lower left side of the abdominal area as indicated on the (AED) diagram, we then activated the machine. After being activated, the machine informed us that no shock was advised. I then began doing chest compressions and breathing for Edwards using a breathing apparatus until Port Allen Fire Rescue and Acadian Units 110 and 115 made scene and began working to revive Edwards. I assisted by helping EMS personnel perform chest compressions until they instructed everyone to stop and advised us that Edwards was deceased.

At that point Sergeant Hicks informed his chain of command of the incident and a Coroner was requested. Assistant Coroner D. Arceneaux  arrived on scene and took possession of the body. I then went back into service.

End of Statement:

_____

Ofc. Dustin McMullan  PA-8
Port Allen Police Department

_____

On-Duty Supervisor

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

TRACEY LEWIS, IN HER CAPACITY
AS NATURAL TUTRIX AND ON
BEHALF OF HER MINOR CHILD, E.E.
(HEIR TO ERVIN EDWARDS)

v.

SHERIFF MIKE CAZES, ET AL

CIVIL ACTION

NO. 13-777-JWD-SCR

JUDGE: JOHN W. deGRAVELLES

MAGISTRATE JUDGE: STEPHEN
C. RIEDLINGER

## <u>DECLARATION OF CASEY WILLIAMS</u>

1.      My name is **CASEY WILLIAMS**.

2.      On November 26, 2013 I was an officer for the Port Allen Police Department.

3.      On November 26, 2013 I was patrolling when Officer McMullan (Port Allen Police Department officer) advised me by radio that per Deputy Ben Arceneaux I was needed to transport Ervin Leon Edwards to the West Baton Rouge Parish Jail.

4.      Attached as Exhibit B-1 is my Incident Report (Complaint # 13-002235) containing my factual investigation of the events that transpired on November 26, 2013 involving Ervin Leon Edwards.

5.      I personally observed and, thereafter, wrote the attached Incident Report (Complaint # 13-002235) pursuant to a legally authorized investigation and as an officer of the law for the City of Port Allen.

6.      All facts and information contained within my Incident Report (Complaint # 13-002235) are true and correct to the best of my recollection at the time I wrote the report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and information.

Executed on this 29th day of April, 2015.

CASEY WILLIAMS



# Port Allen Police Department

## Incident Report

Complaint #: 13-002235

Incident Seq #: 1

## Supplementals

| Supplemental No: | 2 | | |
|---|---|---|---|
| Reporting Officer: | Casey Williams | Reporting Date: | 11/26/2013 |
| Reviewing Officer: | Ronald Kauffman Jr. | Review Date: | 11/27/2013 |

**Narrative:**

On November 26, 2013 I, Officer Williams assisted the West Baton Rouge sheriff office at 111 Lobdell HWY the Chevron. While patrolling, Officer McMullan advised me by radio that per Dy. Ben Arceneaux asked could I transport one B/M to the jail. Upon my arrival Dy, Arceneaux explained that his arrestee was to large to pick up to put inside of his unit. Officer McMullan along with Dy. Randy Austin then placed the subject in the back of my unit. While en route to the jail the subject began banging his head on the passenger window and screaming very loudly. I then advised him to stop, but he continued.

The subject then stopped screaming and stated " I am the devil and once I die tonight I will come back and kill everybody and I love you mommy". As I approached Rosedale RD the subject began kicking the back passenger door and yelling" let me out this mother fucker to set me free". Upon my arrival at the jail, Sgt. Corey Hicks and Cpl. William Alexander were standing in the sally port. Upon exiting my unit Officer McMullan and Dy. Austin arrived. Sgt. Hicks then open the back passenger door and asked the subject to exit vehicle, but he refused to do so. After he refused, Cpl. Alexander and Officer McMullan grabbed his pant legs and lowered him to ground. Officer McMullan and Cpl. Alexander was then able to place him in an escort position and carry him inside the jail. Once inside of the jail, Sgt. Hicks advised Cpl. Alexander to place the subject in male holding. As I was leaving the jail, Sgt. Hicks asked could we escort the subject from male holding to ISO 8.

While escorting the subject to the ISO cell the subject continued being verbally aggressive threatening to kill officers in the area and attempted to pull away from the Officer McMullan and WBR Corporal Alexander. Once they were about to enter the ISO cell he then attempted to refuse to enter the cell by using all of his body weight to the ground. At that time Officer McMullan and Corporal Alexander grabbed the subject underneath his shoulders and pulled him inside the cell. Once the subject was inside the cell we attempted to remove all his restraints. He continued fighting and resisting so Officer McMullan advised him that would use his Taser if he did not stop fighting with the officers. After three verbal commands by Officer McMullan were ignored, he then deployed his Taser using the Drive Stun technique on the subject. The drive stun appeared to have no effect on the subject so Officer McMullan re-holstered his Taser and returned to to helping restrain him. Shortly after we were able to remove all restraints from the subject and exit the isolation cell. Shortly after exiting the cell Dy. Ben Arceneaux informed that subjects mother advised him that he had been smoking Marijuana laced with embalming fluid aka getting WET since Friday afternoon.

Ofc. Casey Williams (PA-3)
Port Allen Police Department

On-Duty Supervisor

EXHIBIT

B-1

ALL-STATE LEGAL®

# WEST BATON ROUGE SHERIFF'S OFFICE
## ARRESTEE INFORMATION SHEET

DATE 11/26/13 TIME 1815 FILE/INCIDENT # 13-110 287
ARRESTING AGENCY WBRSO JKT #

ARRESTEE'S NAME Edwards Ervin L
LAST NAME FIRST NAME MIDDLE INT.
AKA RACE B SEX M DOB
PLACE OF BIRTH: LOCATION OF ARREST 111 Lobdelle Hwy
CITY & STATE
HEIGHT 5'8 WEIGHT 255 EYES Bro HAIR Blk LENGTH Long SKIN TONE Dark
BUILD Heavy GLASSES/CONTACTS N/A MOUSTACHE/BEARD Beard
ADDRESS
NO. & STREET APT/TRAILER # CITY STATE ZIP
PHONE NUMBER Unk DRIVER'S LICENSE NO. STATE YR.
SOCIAL SECURITY # DOC # OR OTHER ID
OCCUPATION (TYPE OF WORK) UNK WAS EVER IN GANG Unk
(IF YES, WHICH GANG)
EMPLOYER'S NAME Unk
EMPLOYER'S ADDRESS Unk PHONE #
MARKS, SCARS, TATTOOS, AMPUTATIONS Unk

MARITAL STATUS: UNK CITIZENSHIP Unk
RELIGION Unk LAST GRADE COMPLETED Unk
SPOUSE OR CONTACT PERSON Unk PHONE
FAMILY: FATHER'S NAME Unk MOTHER'S NAME
SPOUSE'S MAIDEN NAME

RS #: CHARGE: TYPE OF ARREST:
1. 14:103 Disturbing the Peace
2. 14:108 Resisting An Officer (4cts)
3.
4.
5.
6.
7.

HOLDS: NO YES AGENCY
VEHICLE IMPOUNDED (YES/NO) IF YES, WHERE
A SHORT DESCRIPTION OF THE FACTS OF EVENTS WHICH CAUSED THE DEFENDANT TO BE ARRESTED.
See affidavit

ON PROBATION/PAROLE PROBATION/PAROLE OFFICER'S NAME
WARRANTS CHECKED:
(X) NCIC ARRESTING OFFICER'S NAME (PRINT) Dy Ben Arceneack
(X) LOCAL BOOKING OFFICER'S NAME (PRINT)
PROCESSING OFFICER'S NAME (PRINT)

REVISED 8/06 WBRS-10

EXHIBIT C

STATE OF LOUISIANA                    18TH JUDICIAL COURT
PARISH OF WEST BATON ROUGE            PARISH OF WEST BATON ROUGE
                                      STATE OF LOUISIANA

**VERSUS**

_____
Edwards, Ervin L.
( NAME OF DEFENDANT )

## AFFIDAVIT OF PROBABLE CAUSE

BEFORE ME PERSONALLY APPEARED THE UNDERSIGNED LAW ENFORCEMENT OFFICER (S) WHO DEPOSI
THAT THE FOLLOWING RECITED FACTS ARE TRUE AND CORRECT TO THE BEST OF HIS KNOWLEDGE,
INFORMATION AND BELIEF, AND THAT BASED UPON THESE FACTS HE CAUSED THE ARREST OF THE
FOLLOWING LISTED DEFENDANT(S) FOR THE LISTED OFFENSE(S):

|  |  |  |  |
|---|---|---|---|
|  |  | **13-110287** |  |
|  |  | WBRSO FILE NUMBER |  |

| Edwards, Ervin L. | B | M |  |
|---|---|---|---|
| DEFENDANT'S NAME | RACE | SEX | DATE OF BIRTH |

| | 6 | |
|---|---|---|
| ADDRESS | | SOCIAL SECURITY NUMBER |

| Disturbing The Peace | 14:103 |
|---|---|
| **Resisting An Officer   (4CTS)** | 14:103 |
| CHARGE | I.A. REVISED STATUE |

**By appearing in public, namely the Chevron Gas Station located at 111**
PROBABLE CAUSE
**Lobdelle Hwy. in some type of intoxicated/ delirious state. Defendant was**

**involved in a dispute with his fiance. Upon deputies making  contact with the**

**defendant refused to comply with any commands and was placed under**

**arrest. He then began resisting all three deputies to the fullest and once**

**at the WBRDC he  continued to resist numerous deputies by kicking them**

**as they attemtped to uncuff him. This did occur in the parish of WBR.**

Dy. Ben Arceneaux                     _____
AFFIANT                                DEPUTY

SWORN TO AND SUBSCRIBED BEFORE ME THIS _____

DAY OF _____

_____
NOTARY PUBLIC
TO THE SHERIFF OR ANY PEACE OFFICER OF THIS PARISH OR STATE:

YOU ARE HEREBY COMMANDED IN THE NAME OF THE STATE OF LOUISIANA, TO ARREST AND
CAUSE TO BE BOOKED, ONE _____**Edwards, Ervin L.**_____ , WHO
STANDS CHARGED OF _____**Dist. The Peace, Resisting an Officer**_____
AND BRING HIM/HER FORTHWITH BEFORE SAID COURT IN AND FOR THE PARISH OF WEST BATON
ROUGE, TO ANSWER TO THE ABOVE CHARGE(S) ACCORDING TO LAW. GIVEN UNDER MY HAND
AND SEAL AT PORT ALLEN, LOUISIANA, ON THIS THE _____ DAY OF _____
20 _____

_____
18TH JUDICIAL DISTRICT JUDGE

Dr. Susan Garcia
March 31, 2015

1

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF LOUISIANA
 3
 4
 5          CIVIL ACTION NO. 13-777-JWD-SCR
 6            JUDGE JOHN W. deGRAVELLES
 7        MAGISTRATE STEPHEN C. RIEDLINGER
 8
 9
10   TRACEY LEWIS, IN HER CAPACITY AS NATURAL TUTRIX
        AND ON BEHALF OF HER MINOR CHILD, E.E.
11             (HEIR TO ERVIN EDWARDS)
12                   VERSUS
13          SHERIFF MIKE CAZES, ET AL
14
15
16
17
18          Deposition of DR. SUSAN GARCIA, taken on
19   March 31, 2015, at the Jefferson Parish Forensic
20   Center, 2018 8th Street, Harvey, Louisiana 70058.
21
22
23
24   REPORTED BY:
        LESLIE L. NICOSIA
25      CERTIFIED COURT REPORTER
```





Dr. Susan Garcia
March 31, 2015

33

```
 1                 It's on No. 1 on the autopsy
 2         report under "Finding, slash, Summary."
 3             BY MS. GRODNER:
 4                 What page is that?  Sorry.
 5             BY MS. COLLURA:
 6                 If you go forward, Donna.  Flip
 7         one.  There you go.  It says, "Finding
 8         and Summary," 1 through 7.
 9    EXAMINATION BY MS. COLLURA:
10         Q.    So, explain to me sort of your thought
11    process.  How did you list these seven items out?
12         A.    It was my opinion that Mr. Edwards died
13    as a result of acute cocaine and phencyclidine
14    intoxication in association with restraint by law
15    enforcement.  I used the subheadings 1.1 and 1.2
16    to indicate the information that I believe
17    substantiated that conclusion.  Then the remaining
18    2, 3, 4, 5, 6, and 7 are other findings that I
19    thought in my opinion needed to be listed, and all
20    in some form or fashion contributed to death, but
21    were not the cause of death.
22         Q.    So, obviously, you can see we are going
23    to focus on No. 1 because it says "acute cocaine"
24    and what's called "PCP intoxication"; is that
25    fair?
```

Dr. Susan Garcia
March 31, 2015

37

1      Q.    The other thing that I'm trying to parse
2  apart is how it said here "cocaine, PCP
3  intoxication association with restraint by law
4  enforcement," but then No. 3, it says it
5  specifically identifies the taser or the conducted
6  electrical device.
7          So, when you are talking about restraint
8  by law enforcement, are you talking about the
9  physical restraint or the taser?
10     A.    Physical restraint.
11     Q.    So, the taser, it's not encompassed
12  within restraint by law enforcement, in your
13  opinion?
14     A.    It happened during the course of law
15  enforcement involvement and interaction with the
16  individual, which is why I separated it out.
17     Q.    I guess what I'm asking is, when you say
18  here "in association with restraint by law
19  enforcement," are you in your mind including the
20  taser, or is that a separate --
21     A.    It occurred during the same temporal
22  sequence of events.  I separated it out because it
23  was my opinion that the use of a conducted
24  electrical device had nothing to do with his
25  death, but it's a finding.  And it was indicated

Dr. Susan Garcia
March 31, 2015

60

1   to restrain him; is that correct?

2       A.    Yes.

3       Q.    And did you see any evidence that

4   Mr. Edwards was either beaten or kicked at any

5   time before his death?

6       A.    I have no physical evidence other than

7   the superficial abrasion on the superior of his

8   left buttock.

9       Q.    And just so the record is clear, the

10  taser was administered or deployed on his right

11  buttock?

12      A.    That's correct.

13      Q.    And you found no hemorrhaging or any

14  bruises or abrasions on the right buttock; is that

15  correct?

16      A.    Yes.

17      Q.    And what are possible contraction bands

18  of myocardium?

19      A.    That's a microscopic finding, and it's

20  often associated with cocaine intoxication.  It's

21  just an entity where the individual myocardial

22  fibers are contracting in such a manner that they

23  stain in a particular way, that look a certain way

24  under the microscope.  They're referred to as

25  contraction bands.

Dr. Susan Garcia
March 31, 2015

63

```
 1                    REPORTER'S PAGE

 2

 3           I, Leslie L. Nicosia, Certified Court

 4    Reporter, in and for the State of Louisiana, the

 5    officer, as defined in Rule 28 of the Federal

 6    Rules of Civil Procedure and/or Article 1434 (B)

 7    of the Louisiana Code of Civil Procedure, before

 8    whom this sworn testimony was taken, do hereby

 9    state on the record;

10           That due to the interaction and the

11    spontaneous discourse of this proceeding, dashes

12    (--) have been used to indicate pauses, changes in

13    thought, and/or talk-overs; that same is the

14    proper method for a court reporter's transcription

15    of proceeding, and that the dashes (--) do not

16    indicate that words or phrases have been left out

17    of this transcript; that any words and/or names

18    which could not be verified through reference

19    material have been denoted with the phrase

20    "phonetically spelled."

21

22              _____
                Leslie L. Nicosia, C.C.R.
23

24

25
```

Baton Rouge Court Reporters, LLC
225-292-8686

04/24/2014  00:40   2253362430        WBR CORONER OFFICE              PAGE 03/17

530-13-WB



# Jefferson Parish Forensic Center
## 2018 8th Street
## Harvey, LA 70058
## (504) 365-9100 • (504) 365-1750 Fax



Accredited by
the National Association of
Medical Examiners

Gerry A. Cvitanovich, M.D.
Coroner

## Autopsy Report

**NAME:**                          Edwards, Ervin
**ADDRESS:**                       ::
                                   Jennings, LA
**DATE OF BIRTH:**                     5 (38 years)
**DATE AND TIME OF DEATH:**        November 26, 2013 @ 7:32 P.M.
**DATE, TIME, PLACE OF AUTOPSY:**  November 27, 2013 @ 7:45 A.M. @
                                   Jefferson Parish Forensic Center,
                                   Harvey, La.
**BODY IDENTIFIED BY:**            West Baton Rouge Parish Coroner's
                                   office toe tag.
**SECURITY TAG NUMBER:**           0026428
**AUTOPSY AUTHORIZED BY:**         Philip Padgett, M.D., Coroner West
                                   Baton Rouge Parish

### ATTENDANCE

**PROSECTOR:** Susan M. Garcia, M.D., Forensic Pathologist
*Susan M. Garcia MD  4-1-2014*
**ASSISTED BY:** Shelley Lucius and Dwana Bailey, Jefferson Parish
Coroner's Office
**ALSO PRESENT:** Detective T. Schiro, West Baton Rouge Sheriff's Office;
Mark Bone, Chief Medical Legal Death Investigator (acting as
photographer), Jefferson Parish Coroner's Office

### FINDINGS/SUMMARY

1.0   Acute cocaine and phencyclidine intoxication in association with
      restraint by law enforcement.
      1.1   Cocaine: 68 ng/mL in iliac blood.
            Benzoylecgonine: 660 ng/mL in iliac blood.
            Phencyclidine: 160 ng/mL in iliac blood.
      1.2   Decedent restrained in prone position by law enforcement.
            1.2.1 No scleral hemorrhages, eyes (gross observation)
            1.2.2 No marginal emphysema by microscopy (lungs).

1



EXHIBIT
D-1

**530-13-WB**

2.0   Morbid obesity.
    2.1   Body mass index 47.8 — Class III obesity
    2.2   Increase in abdominal and visceral fat.
    2.3   Cardiomegaly — 660 gram heart.

3.0   Decedent sustained one 5-second deployment of conducted
    electrical device in drive stun mode to right buttock area.
    3.1   No evidence of abrasion or hemorrhage in buttock area.

4.0   Injury
    4.1   Superficial abrasion, left flank, 4 ¾ inches.
    4.2   Intramuscular hemorrhage, tongue, 2 mm.

5.0   Microscopic findings
    5.1   Possible "contraction bands", myocardium.
    5.2   Rare septal breakdown, alveoli, lungs.
    5.3   Macrovesicular fatty change — liver.
    5.4   Generalized vascular congestion.

6.0   Remaining toxicology
    6.1   THC detected - iliac blood.
    6.2   Caffeine and nicotine present in urine and iliac blood.
    6.3   Ethanol negative.

7.0   Provided DVRs, witness statements and records of CED reviewed.

2

530-13-WB

## SUMMARY

This is the case of a 38-year-old male who died on November 26, 2013 in the West Baton Rouge Detention Center.  The decedent's medical history is significant for drug abuse. DVRs of the event were provided, reviewed and returned.  The sequence of events is as follows: the decedent collapsed, for unknown reasons, while being transported to a holding cell.  The decedent was then dragged into the cell, placed in a prone position and law enforcement personnel attempted to remove handcuffs (plastic zip-tie type).  During the course of removal, the decedent became agitated and at least 5-point restraint was applied.  It then becomes unclear as to whether law enforcement placed themselves on the decedent's back or not.  During the struggle a CED was applied to the right buttock area for 5 seconds (record reviewed).  The decedent eventually became motionless, the handcuffs removed and law enforcement exited the cell.

After a period of time (during which the decedent remained motionless), law enforcement checked the cell and noticed that the decedent was unresponsive.  Resuscitative efforts were initiated but ultimately unsuccessful.

An autopsy was performed on November 27, 2013 at the Jefferson Parish Forensic Center.  After review of the gross and microscopic findings, review of the DVRs, witnessed statements and CED records and interpretation of the toxicology results, it is my opinion that the decedent died as a result of acute cocaine and phencyclidine intoxication in association with restraint by law enforcement.  It is my opinion that this death be classified as undetermined.

530-13-WB

## EXPERT MEDICAL NARRATIVE

### EXTERNAL EXAMINATION

The decedent is received in a silver body bag.  The seal is removed and the body is X Rayed by Jefferson Parish Forensic Center.  An identification photograph and all other photographs are taken by Jefferson Parish Forensic Center.

The decedent is clad in a red t-shirt, 2 red sneakers, 2 white socks, blue boxers with a "Superman" design and blue jeans.  Also accompanying the body are 2 brown prescription type bottles-the bottles are turned over to toxicology.  The clothing is removed from the body and the decedent is removed from the body bag and transferred to an autopsy table.  The external examination commences as follows:

The body is that of a normally developed male appearing older than the recorded age of 38.  The body measures 71 inches in length and weighs 343 lbs. for a calculated body mass index of 47.8 which is considered to be class III obesity.  The body is in a good state of preservation with posteriorly distributed, not fixed; reddish-purple lividity.  Rigor mortis is fully developed and the body is cold to the touch after brief refrigeration.  The scalp is normal.  The head hair is done in braids close to the scalp with tips ranging between 1 and 2 ½ inches.  The ear lobes do not appear to be pierced.  A goatee is present on the chin.  A thin line of hair from the jaw line to the chin is present on the cheeks.  A small moustache is present on the upper lip.  The eyes are closed with clear corneas and brown irides.  Arcus senilis is present bilaterally.  No conjunctival petechiae are present.  There is congestion of the bulbar and palpebral surfaces.  The medial aspect of the bulbar surface on the right is congested and the lower palpebral surface is congested.  On the left eye the medial bulbar surface is congested.  No distinct scleral hemorrhage is identified – eyes are photographed and retained.  The mouth has natural teeth in fair condition.  The abdomen is markedly protuberant.  The external genitalia are that of a normal circumcised male with bilaterally descended testes.  There is no scrotal swelling.

**Identifying marks and scars:**  See body diagram.  Tattoos are as follows: what appears to be a bulldog head wearing a hat and a spiked collar on the left upper chest, what appears to be the word 'MACK' on the left arm, what appears to be the initials 'VIN' an illegible letter and then the letter 'Y' on the ventral left forearm, an illegible tattoo on the dorsal aspect of the left forearm, what appears to be the word 'Why' an illegible tattoo and what appears to be the words 'Hate Me' on the ventral right forearm, the name 'Ervin' on the dorsal aspect of the right hand, an illegible tattoo on the dorsal aspect of the right forearm and back.

4

**530-13-WB**

Scars are as follows: There are hyperpigmented areas of the skin possibly consistent with previous thermal burns on the right upper shoulder, the dorsal right forearm near the elbow, the posteromedial aspect of the right calf, the posterior aspect of the left calf, the medial aspect of the right calf, anterior aspect of the left shin.

Hypopigmented areas are present on the right forearm, anterior right chest and anterior left shoulder.

There is a scar above the right buttock approximately ½ inch in length and a 3 inch scar on the top of the left shoulder.

**Evidence of treatment:** See body diagram.  There is an endotracheal tube in the mouth (tip superior to carina), defibrillator pads are present on the upper anterior chest and left lower quadrant, ECG pads are present on the left upper chest, right upper chest and right lower quadrant.  An intraosseous catheter is in the right shin.

**Evidence of injury:**  There is a single 4 ¼ inch curvilinear superficial abrasion on the posterior aspect of the body above the left buttock in the left flank area.

There are no other marks of injury or trauma to the body.


**INTERNAL EXAMINATION**

The body and head are opened in the usual autopsy fashion.

**BODY CAVITIES:**  Adhesions are present in the left chest cavity.  No abnormal fluid accumulations are present in any body cavity.

**BODY FAT:**  4.0 cm. of fat covers the chest and 7.5 cm. of fat covers the abdomen.  There is a marked increase in intra abdominal and visceral fat.

**CENTRAL NERVOUS SYSTEM:**  The brain weighs 1320 gms.  Meninges are clear and delicate.  Meningeal vessels are not congested.  Gyri and sulci are grossly normal.  There is sharp demarcation between gray and white matter.  No discreet lesions are noted on the sectioned surfaces of the cerebral of cerebellar hemispheres.  Gray matter does not appear cyanotic.  Brain does not appear edematous.  Eyes as previously described.

**NECK:** Hyoid and larynx are intact (hyoid and larynx retained).

5

**530-13-WB**

**CARDIOVASCULAR SYSTEM:** The heart weighs 660 gms. There are fatty streaks along the aortic intimal surface. The coronary arterial system is right dominant. There is a thinned 1 to 2 mm. sliver of epicardium covering the left anterior descending coronary artery in its midportion. Coronary arteries are all widely patent. The ventricular chambers are moderate to markedly dilated. The left ventricular wall is 1.6 cm. thick. The right ventricular wall is 0.3 cm. thick. No myocardial lesions are identified.

**RESPIRATORY SYSTEM:** The right lung weighs 960 gms.; the left lung weighs 740 gms. Tracheobronchial mucosa is smooth and glistening with no abnormal lesions. Along the inferior margin of the right upper lobe are small blebs measuring less than 1 mm. On the lateral aspect of the right upper lobe is a 6 x 1 cm. subpleural hemorrhage. The remaining sectioned surfaces of the lungs are edematous and congested. Anthracotic pigment is not appreciated. No pulmonary emboli are identified.

**HEPATOBILIARY SYSTEM:** The liver weighs 2410 gms. Inferior margins are not blunted. The sectioned surface is homogeneous and red-brown. No discreet lesions are identified. The gallbladder is identified and contains bile but no stones.

**GASTROINTESTINAL SYSTEM:** An appendix is identified. The esophagus and stomach are intact. The tongue is removed and on serial sectioning there is a 2 mm. focus of intramuscular hemorrhage on the lateral aspect of the tongue with no overlying mucosal injury. The stomach contains less than 1 cc. of green-brown mucoid material which is retained. Small and large bowel contain fecal material. Pancreas is grossly normal.

**GENITOURINARY SYSTEM:** Right kidney weighs 280 gms.; left kidney weighs 360 gms. The capsules strip with ease. The cortical surfaces are smooth. The cortices are not thinned. The ureters are not dilated. The bladder mucosa is smooth. The bladder contains approximately 5 cc. of urine. The prostate is grossly normal. The testes are removed and there is no evidence of hemorrhage in the scrotal sac or on the sectioned surface of the testicular parenchyma.

**ENDOCRINE SYSTEM:** Thyroid and adrenal glands are grossly normal.

**HEMATOPOIETIC SYSTEM:** The spleen weighs 120 gms. and is grossly normal.

**MUSCULOSKELETAL SYSTEM:** No hemorrhage is present in the subscalpular tissue or subcutaneous tissue of the anterior and posterior aspect of the body, upper and lower extremities (photographs taken). Multiple radiographs fail to demonstrate any fractures.

530-13-WB

## SPECIMENS DRAWN FOR TOXICOLOGY

BLOOD X (ILIAC)  URINE X  VITREOUS  X BILE X  GASTRIC CONTENT X  OTHER X (FRESH LIVER, FRESH KIDNEY & FRESH BRAIN; 2 BROWN PERSCRIPTION BOTTLES ARE ALSO SUBMITTED TO TOXICOLOGY)

NOTE:  Toxicology specimens and tissues are retained for 1 year only (from the date of autopsy).

## MICROSCOPIC EXAMINATION

A.    **Heart, coronary artery:** Coronary artery widely patent. Irregular staining of myocardial fibers possibly suggestive of "contraction bands". Capillary congestion. Rare collection of lipofuscin granules within myocardial fibers.

B, C    **Lungs:** Pulmonary edema and vascular congestion. Pigment-laden macrophages within alveolar spaces. Occasional clubbing of alveolar septae. Focal and minimal extravasation of red blood cells into alveolar spaces. Rare septal breakdown adjacent to pleural surfaces; adjacent alveoli with septal clubbing. Focal atelectasis. No marginal emphysema noted. No foreign material seen with polarization.

D.    **Tongue:** No mucosal abnormalities. Recent deep intramuscular hemorrhage (focal) with no adjacent inflammatory response.

E.    **Liver:** Macrovesicular fatty change, hepatocytes – moderate. No inflammation of portal triads. Focal sinusoidal congestion.
       **Kidney:** Capillary congestion. No significant histopathological abnormalities.

F.    **Testis:** No significant histopathological abnormalities.
       **Cerebellum:** No meningeal inflammation. Rare loss of Purkinje neuron.

G.    **Cerebral cortex:** No meningeal inflammation. Rare hypoxic neuronal changes.

H.    **Hippocampus (brain):** Capillary congestion. Rare, focal hypoxic neuronal change.

I.    **Heart:** Same changes as seen in slide A.

J.    **Heart:** Same changes as seen in slide A & I. Section of right ventricle with no histopathologic abnormalities.

530-13-WB

## DISPOSITION OF EVIDENCE

The clothing is released with the body.

FTA card collected and retained in the Toxicology Laboratory at the
Jefferson Parish Coroner's Office.

Susan M. Garcia, M.D.
Forensic Pathologist

8

CASE NO. 530-13WB       NAME  Ervin Edwards  (SMG)
11-27-13

Tattoos    Identifying
Scars      marks



CASE NO. _530-13 WB_    NAME _Ervin Edwards_

11-27-13

## THERAPY



ET

defib

ECG

ECG

defib

ECG

ECG

ID



04/24/2014  00:40    2253362430              WBR CORONER OFFICE              PAGE  13/17

CASE NO. 530-13WB     NAME  Ervin Edwards

11-27-13

INJURY





4 1/4"
superficial
abrasion

Assessment of Issues in the Matter:

**Tracy Lewis**
**vs**
**Sheriff Mike Cazes and**
**Deputies X, Y and Z in their**
**capacities as deputies for the sheriff of**
**West Baton Rouge Parish**
**United States District Court**
**Middle District of Louisiana**
**Civil Action No. 13-777**

**Report**
**submitted to:**

**Donna U. Grodner**
**Attorney at Law**
**2223 Quail Run, B-1**
**Baton Rouge, Louisiana**
**70808**

**By:**

**William J. George, Ph.D.**
**Emeritus Professor of Pharmacology/Toxicology**
**Tulane University School of Medicine**
**New Orleans, Louisiana**
**70112**

**Submitted**
**February 10, 2015**



EXHIBIT

E

# DR. WILLIAM J. GEORGE

**RE: Tracy Lewis vs.**
**Sheriff Mike Cazes, et al**

## I.     Expert Qualifications

Dr. George is a Pharmacologist and Toxicologist with over 45 years of experience as such.  He has conducted research and published numerous articles in peer-reviewed journals on a wide range of toxicological issues. He has served as Course Director for offerings in toxicology at Tulane University for medical students and graduate students with respect to basic principles of toxicology that are central to his expected testimony in this case.  His work has been supported by extramural funds through governmental, industrial and/or private agencies.  Dr. George's academic appointments have included being Director of Toxicology at the Tulane University School of Medicine and Director of the Tulane Drug Analysis Laboratory, a nationally certified toxicology laboratory.  **(Exhibit A)**

## II.     Area of Expertise

The area of expertise in which Dr. George will be tendered is pharmacology and toxicology including, but not limited to, expertise in general toxicology and exposure assessment. Dr. George has served as Professor of Pharmacology and Director of Toxicology at the Tulane University School of Medicine. He has also held appointments as Professor of Environmental Health, Professor of Pathology, as well as Professor of Psychiatry and Neurology.

## III.     Past Experience in Legal Cases

Dr. George has been recognized as an expert in pharmacology, toxicology and environmental health in federal and state courts throughout the country.  Over the last 4 years, he has participated in a number of cases, either in court or in deposition testimony. **(Exhibit B)**

3

### IV.    Compensation

Dr. George has been paid an initial retainer of $2,500. Additional compensation for services rendered in this matter is expected according to the attached fee schedule. **(Exhibit C)**


### V.    Issues Concerning This Case

As I understand it, at around 5:56 PM on the afternoon of November 26, 2013, Ervin Leon Edwards was involved in a disturbance at a Chevron gas station located at the intersection of Allendale and Court Streets in West Baton Rouge Parish, Louisiana and arrested for disturbing the peace. Law enforcement personnel arrived at the gas station and attempted to restrain Mr. Edwards who, according to the Port Allen Police Department incident report, was combative and resisting arrest. Additional law enforcement personnel were called and Mr. Edwards was placed in a patrol car and then transported to the West Baton Rouge Detention Center. After arrival at the detention center, the deputies were met by other officers and Mr. Edwards was carried or dragged into a jail isolation cell. According to the incident report, after his handcuffs were removed, Mr. Edwards continued to resist officers as they were removing zip ties which were restraining his ankles, causing them to stop because of his heavy kicking. At that point after he did not comply with warnings to calm down, Mr. Edwards was Taser "drive stunned" on the upper portion of his right hip. (This report does not render any opinion as to the duration of tasing in this case or whether the video correlates with the incident report discussed above.)

The officers then removed all restraints from Mr. Edwards as 6 deputies held him down. The deputies then exited the cell, at around 6:29 PM, at which time it was noticed that Mr. Edwards was unresponsive. Cardio-pulmonary resuscitation (CPR) was initiated at approximately 6:45 PM (about 16 minutes after Mr. Edwards became unresponsive) and was continued until EMTs arrived at approximately 6:51 PM. The EMTs continued to resuscitate Mr. Edwards but Mr. Edwards failed to recover and he died. An autopsy was conducted at the Jefferson Parish Forensic Center on November 27, 2013, at which time iliac blood was drawn from the body for toxicology testing.

The blood specimen was analyzed at both the Jefferson Forensic Center Laboratory and at the National Medical Services Laboratory in Willow Grove, Pennsylvania. Results of the analysis showed blood levels of phencyclidine (PCP) at 160 ng/ml, cocaine at 68 ng/ml and benzoylecgonine at 680 ng/ml.

The questions I have been asked to address are (a) what is the significance of the finding of cocaine and phencyclidine in the blood obtained from Mr. Edwards, (b)

what are the known pharmacological effects of cocaine and phencyclidine and (c) would the presence of cocaine and phencyclidine at the levels at detected in the blood have resulted in or contributed to a sudden death event as Mr. Edwards was being tasered/ restrained.

**VI.**    **Opinions of Dr. William George**

The presence of **cocaine** and **phencyclidine** in the iliac blood obtained from Mr. Edwards at the levels as reported indicate that he had used cocaine and phencyclidine within hours **prior to his death.**

**Cocaine**
Cocaine is a local anesthetic which is highly abused because of its euphoric effect and which manifests its effects through a number of mechanisms including its ability to block **sodium channel** conductance and its ability to block the neuronal reuptake of neurotransmitters including norepinephrine, dopamine and serotonin. Norepinephrine is responsible for classic adrenergic effects including mydriasis, vasoconstriction. hypertension and tachycardia.    **Behavioral effects** of cocaine appear to be mediated by **dopaminergic mechanisms**. These are effects which may be of toxicologic importance (Isenschmid, 2002).    Cocaine consists of ester moities, rendering it susceptible to hydrolysis, both in vitro and in vivo.   It is metabolized primarily to benzoylecgonine and ecgonine methyl ester.

The average **half life for cocaine**, based on the literature, is **60-90 minutes**, although one study indicates that there is a shorter half life after smoking cocaine than after either insufflation or intravenous administration (Jeffcoat, et al, 1989).

As indicated above, the presence of cocaine in the blood is evidence of the use of cocaine within several hours prior to being monitored. Cocaine is a central nervous system stimulant and a local anesthetic. It produces effects on the autonomic nervous system including mydriasis and tachycardia.   **Direct initial effects** of cocaine use include euphoria, excitement, mood changes, nervousness, impulsiveness, anxiety, syncope, tachycardia and aggressive behavior.   **Later effects** of cocaine, which occur during cocaine elimination from the body, include apprehension, depression, fatigue, and impaired concentration. Syncope or lightheadedness is reported to be a common effect which occurs with cocaine use.

Death resulting from high dose cocaine overdose is well known.  One significant toxic response to cocaine associated death is a cocaine induced psychosis which is also called cocaine-induced-, excited-, or agitated-delirium.    This syndrome is characterized by severe hyperthermia (104-108 degrees Fahrenheit), extreme agitation, delirium, respiratory arrest and death which often occurs suddenly after agitation has ceased (Isenschmid, 2002; Wetli, 1985).

**Cardiovascular complications** are among the most common and dangerous consequences of cocaine abuse, ranging from cardiac **arrhythmias** to **sudden**

**death.** The central effects of cocaine are known to trigger an increase in circulating catecholamines, resulting in vasoconstriction, increased myocardial oxygen demand and myocardial ischemia (Perper JA, 1992). The minutes immediately after cessation of strenuous exercise has been termed the "vulnerable period" regarding the occurrence of lethal cardiac arrhythmias during which serum potassium levels rapidly decline and catecholamine levels (norepinephrine) are elevated to near maximal levels, which would be expected to contribute to vulnerability to post exercise arrhythmias (Young DB, et al, 1992).

The more **immediate euphoric effect** of cocaine may last for **20-45 minutes,** after which restlessness, irritability and depression result. Insomnia, chronic fatigue and problems with ability to concentrate are common adverse reactions, which occur as the drug is being eliminated.

Following use of cocaine, it is expected that one would have experienced a 20-40 minute period of euphoria, followed by central nervous system impairment lasting for a number of hours and even longer. Benzoylecgonine is the primary metabolite of cocaine and is routinely monitored in drug tests as an indication of the use of cocaine.

The laboratory drug tests in this matter were conducted by the Jefferson Parish Forensic Center Laboratory and also by a highly recognized certified national testing facility. The positive test for benzoylecgonine (B/E) the primary cocaine metabolite in blood at 680 ng/ml is also consistent with Mr. Edwards' use of cocaine within a matter several hours prior to the time of his arrest and/or death.

The level of cocaine for Mr. Edwards was determined in blood obtained from his body at the time of autopsy on the morning of November 27, 2013 and the analysis of the blood was not completed until sometime thereafter. Therefore, the level of cocaine in blood at the time of his arrest may be expected to have been even higher than the 68 ng/ml which was reported.

It should be noted that acute cocaine intoxication is associated with several phases. In fatal cases, the onset and progression are accelerated with convulsions and death frequently occurring within minutes to up to 30 minutes (Burnett, LB, 2014). In this case where a fatality occurred, any unnecessary delay in getting treatment for cocaine toxicity would have increased the risk of such progression.

**Phencyclidine**

Phencyclidine (PCP) is a synthetic dissociative anesthetic originally developed as a general anesthetic for humans. However, it was soon discovered that patients on whom phencyclidine was used were experiencing delusions, severe anxiety and agitation when emerging from the drug's effects. There is no current legitimate use in humans. Recreationally, phencyclidine is used as a psychedelic and hallucinogen. The routes of administration include smoking, snorting, and taking

6

the drug by oral or intravenous administration.    Phencyclidine, which is well absorbed following all routes of administration, has an elimination half-life of about 7-46 hours with a mean of 21 hours.

The mechanism of action of phencyclidine involves many different pharmacologic receptors which regulate dopaminergic, anticholinergic, and opiate like actions.  **Psychological effects** of phencyclidine include euphoria, feelings of strength and invulnerability, disorientation, loss of coordination, distorted sensory perceptions, impaired concentration, disordered thinking, illusions and hallucinations, agitation, combativeness or violence, memory loss, sedation and stupor (NHTSA, 2004).  **Physiological effects** of phencyclidine include elevated blood pressure, increased heart rate, blurred vision, muscular incoordination and anesthesia. In the anesthetized state, individuals remain conscious.  Other effects of phencyclidine include **combativeness,** severe **anxiety, paranoia** and **seizures,** which are sometimes fatal.

**Sudden death** as a result of phencyclidine intoxication is well known, although death resulting from phencyclidine is not seen as frequently as it is with cocaine (Pestaner, 2003).  However, phencyclidine has been shown to be associated with death at **blood levels** ranging from **1-598 ng/ml** (deRoux, 2011).  And, it has been suggested that when violent people die during arrest, the police may be advised to consider phencyclidine as the cause for the violent behavior.

It should be noted that just as acute cocaine intoxication is associated with several phases, phencyclidine may also undergo progression resulting in seizures which are sometimes fatal. Therefore in acute toxicity situations, proper medical treatment should be provided as soon as possible.

In the publication of Pestaner, et al (2003), two deaths were described which occurred during arrest, and which were considered to have been associated with the effects of **phencyclidine.**  One of the cases appears to be somewhat similar to the present matter under assessment.    In the reported matter, the arrestee continued to act irrationally and kicked out the windshield of the police car.  He was then removed from the car and placed in a grassy area in the **prone position**. Soon after being in this position, the individual continued to move, but the movements were not as pronounced, and then he became unresponsive.

 In the second matter, a 31 year old man was involved in a disturbance in the street and yelling for no apparent reason. The police decided to detain him for evaluation, but he resisted. After a struggle, he was **placed prone** on the back seat of the police car and transported to the area medical center. He was carried into the emergency department and **placed prone** in front of a desk. Minutes later, he was found unresponsive, with no vital signs. It was concluded by the authors of this report that **mental** and **physical stress** were factors and that in addition, being placed in a **prone position** was also a common denominator.  And, it was further concluded that force applied by the arresting officers on the back of the

individuals for a period of time would have **compromised respiration** (Pestaner, et al, 2003).

While this report does not address prolonged tasing, a specific claim which may be made at trial is that the collapse and death of Mr. Edwards is the result of being taser stunned by the officer/deputies to subdue him as he was resisting arrest. And, it is likely that the process of being tasered contributed to the stress being experienced during the time he was being held on the floor of the jail cell. However, there is limited evidence in the peer reviewed scientific literature concerning injury to unimpaired people who are subdued by tasers in the course of being taken into custody by law enforcement personnel. This opinion is based on a variety of studies during the last 15 years, which indicate a lack of scientific documentation of significant injury to individuals being subdued by tasers. For example, a large independent multicenter study in which more than 99 percent of the subjects did not experience significant injury following conducted electrical weapon use. (Bozeman, 2009). Another study reports that there is little or no credible evidence of cardiac arrhythmias in individuals as a result of being tased (Kroll, 2009). A publication in 2011 using more recent taser devices reports that a causal link has not been established between the use of a taser in the course of subduing an arrestee and the occurrence of adverse effects in normal individuals. This author reviewed the published literature and concluded that people who have undergone restraint via a taser device have been found to have preexisting conditions which could place them at increased risk (Sanford, 2011). And, it should be pointed out that although a publication by Ho and Dawes (2011) indicates that the use of tasers may produce rhabdomyolysis, the authors' conclusion was that the effect of being tasered would be mild and/or unlikely. And, in this current matter, there were no reported signs of rhabdomyolysis for Mr. Edwards. In addition, the taser was applied to the hip as opposed to locations on the torso.

In summary, it is my opinion as a pharmacologist/toxicologist that the level of cocaine and phencyclidine in blood and the physical stress which occurred during the process of being restrained in the detention facility were significant factors in producing the sudden collapse and death of Mr. Edwards. In addition, the process of being subjected to taser shock while in a prone position would have added to the stress of an individual who was impaired/intoxicated by cocaine and phencyclidine. And, with respect to the fatal outcome, there was a period of 16 minutes after Mr. Edwards became unresponsive before resuscitation efforts were initiated. Such a delay is in a time frame when irreversible damage is more likely to occur. (Safar, 1993)

These factors should be considered to be the **significant** issues, resulting in the sudden collapse and ultimate **death** of Mr. Edwards on November 26, 2013. This opinion is for the most part consistent with information on The Certificate of Death for Mr. Edwards which indicates that the cause of death was (a) acute

8

cocaine and phencyclidine intoxication, (b) restraint by law enforcement, (c) morbid obesity and (d) sustained deployment of a conducted electrical device.

I base my opinions on my education, training and experience, as well as my review of the scientific literature and the facts provided me in this matter. I also reserve the right to supplement and/or amend this report, as more information becomes available.

## VII. Specific Documents Relied Upon As The Basis For Opinions Rendered In This Matter

(1) A Port Allen Police Department incident report (No. 13-002235), dated November 26, 2013.

(2) A Port Allen Police Department/use of force report form concerning Ervin Leon Edwards, dated November 26, 2013.

(3) A West Baton Rouge Parish Coroner's Investigator Report for Ervin Edwards (Case No. 13-143).

(4) The autopsy report of Dr. Susan Garcia, forensic pathologist, from the Jefferson Parish Forensic Center, dated April 1, 2014.

(5) Toxicology reports (x2) for Ervin Edwards from the Jefferson Parish Forensic Center, dated December 4, 2013.

(6) A toxicology report for Ervin Edwards from the National Medical Services Laboratories, dated December 13, 2013.

(7) A State of Louisiana Certificate of Death for Ervin Leon Edwards, dated December 1, 2013.

(8) Copies of photographs of Ervin Edwards.

(9) Copies of videos, concerning Ervin Edwards, from West Baton Rouge Detention Center, dated November 26, 2013.

(10) Personal statements of Port Allen City police officers (x5).

(11) Personal witness statements of Tori Paddio and George Lowdens.

(12) In addition, I have reviewed the scientific literature concerning the pharmacology of phencyclidine and cocaine with a special interest in the incidence of sudden death. I have also reviewed the scientific literature for information concerning sudden death and the application of taser shock in individuals who had used ilicit drugs such as cocaine or phencyclidine.

I declare under penalty of perjury that the above and foregoing is my expert report.


 /s William J. George
William J. George, Ph. D
Emeritus Professor
Pharmacology and Toxicology
Tulane University School of Medicine
February 10, 2015

9

**RELIANCE LIST**
**Exhibit D**

A.  Cocaine-Effects on Human Performance and Behavior
    D.S. Isenschmid
    Forensic Science Review 14:2002.

B.  Medical Toxicology by M.J. Ellenhorn and D.J. Barceloux.

C.  Disposition of Toxic Drugs and Chemicals in Man;
    Randall C. Baselt
    Seventh Edition (2004).

D.  Urinary Excretion of Cocaine and Metabolites in Humans:  A Kinetic
    Analysis of Published Data.
    John Ambre;
    Journal of Analytical Toxicology;
    9: 241-245 (1985).

E.  Cocaine and Benzoylecgonine Excretion in Humans;
    Hamilton, H., et al.
    Journal of Forensic Sciences; (1977).

F.  Neuropsychological deficits in abstinent cocaine abusers:  preliminary
    findings after two weeks of abstinence.
    Berry, J., et al.
    Drug and Alcohol Dependence;
    32: 231-237 (1993).

G.  Pharmacokinetics and Pharmacodynamics of Cocaine;
    Cone, Edward;
    Journal of Analytical Toxicology;
    19: 459-478 (1995).

H.  Physicians' Desk Reference (2006).

I.  National Highway Traffic Safety Administration/NHTSA.
    Drugs and Human Performance Fact Sheets (2004).

J.  Bozeman WP, Hauda WE, Heck JJ, Graham DD, Martin BP
    and Winslow JE
    Annals of Emergency Medicine
    53: 480-489 (2009).

10

K.    Zimmerman JL
      Critical Care Clinics
      28: 517-526 (2012).

L.    Sanford JM, Jacobs GJ, Roe EJ, Tendrup TE
      Journal of Emergency Medicine
      40: 28-32 (2011).

M.    Kroll MW
      J of Forensic and Legal Medicine
      16:173-177 (2009)

N.    Ho JD and Dawes DM
      Journal of Emergency Medicine
      40: 68-69 (2011).

O.    Brody SL, Wrenn KD, Wilber, MM and Slovis CM
      Annals of Emergency Medicine
      19:1137-43 (1990).

P.    Menacher J, Farcy, DA, Boswell SA, Stein DM, Dutton RP, Hess JR and
      Scalea TM
      Journal of Emergency Medicine
      41:e49-53 (2011).

Q.    Aloncher L., Meneguzzi MB, Rudolf G and Criado F.
      Argentinan Achives of Pediatrics
      106: 454-457 (2008).

R.    Blaho K., Winbery S., Park L., Logan B., Karch SB and Barker LA
      Journal of Clinical & Forensic Medicine
      7: 71-76 (2000).

S.    Crandall CG, Vongpatanasin W and Victor RG
      Annals of Internal Medicine
      136: 785-791 (2002).

T.    Ruttenber AJ, McAnally, HB and Weth CV
      American Journal of Forensic Medicine and Pathology
      20: 120-127 (1999).

U.    Jeffcoat AR, Perez-Reyes M, Hill JM, Sadler BM and Cook CE
      Drug Metab Dispos
      17: 153-159 (1989).

11

V.   Wetli, CV and Fishbain, DA
     J. of Forensic Sciences
     30: 873-880 (1985).

W.   Isenschmid DS, Levine BS and Caplan YH
     Journal of Analytical Toxicology
     13: 250-256 (1989).

X.   Young DB, et al.
     American Journal of Medical Sciences
     304:150-154 (1992).

Y.   Mets B, Jandar S. and Landry D.
     Life Sciences
     59: 2021-2031 (1996).

Z.   Perper JA and Van Thiel DH
     Recent Developments in Alcoholism
     10: 343-61 (1992).

AA.  Pestaner, JP, et al
     Sudden Death During Arrest and Phencyclidine Intoxication
     American J. of Forensic Medicine and Pathology
     24:119-122 (2003).

BB.  deRoux, SJ, et al
     Phencyclidine: a Five year Retrospective Review from
     the New York City Medical Examiners Office
     Journal of Forensic Sciences
     56: 656-659 (2011).

CC.  McCarron, MM, et al
      Acute Phencyclidine Intoxication:
     Incidence of Clinical Findings in 1,000 Cases
     Annals of Internal Medicine
     10:237-242 (1981).

DD.  Domino, REF and Luby, ED
      Phencyclidine/schizophrenia
      Schizophrenia Bulletin
      38:914-919 (2012).

EE.  Safar, P.
     Cerebral Resuscitation after Cardiac Arrest
     Annals of Emergency Medicine
     22: 324-349 (1993).

12

FF.  Burnett, LB, et al
     Cocaine Toxicity
     Medscape
     April, 2014
     http://medicine.medscape.com/article/813959-overview.

March 6, 2015


MEDICAL REVIEW




**SUBMITTED TO:**  Amanda M. Collura, Associate

Kean – Miller Attorneys at Law

400 Convention St. Suite 700

Baton rouge, LA 70821






**PERTAINING TO:**  *Tracey Lewis, in her capacity as Natural Tutrix and on*

*Behalf of Her Minor Child, E.E. (Heir To Ervin Edwards) v.*

*Sheriff Mike Cazes, et al*

*USDC, Middle District of LA; CA No. 13-777-JWD-SCR*

*KM File No. 425-1181; RMI Claim No. 2013L0622*






**PREPARED BY:**  Thomas C. Arnold, MD, FAAEM, FACMT

Professor and Chairman

Department of Emergency Medicine

LSU Health Science Center – Shreveport

Medical Director, Louisiana Poison Center



EXHIBIT

F

ALL-STATE LEGAL®

Thomas C. Arnold, MD – Medical Review

**Material Reviewed:**

1. Plaintiff's amended complaint dated 7/22/2014

2. Officer McMullan and Officer Williams' Port Allen Police Department Incident Report, Complaint # 13-002235

3. Port Allen Police Department Use of Force Report Form

4. Officer McMullan's Taser Report

5. Jefferson Parish Forensic Center Report

6. Video footage of the November 26, 2013 incident

7. Expert Report of William J. George, Ph.D.

8. Coroner's Report of Susan M. Garcia, MD

Dear Ms. Collura,

By way of introduction, I have served as the Chairman of the Department of Emergency Medicine at LSU Health Sciences Center in Shreveport, Louisiana since 2001 and as Medical Director of the Louisiana Poison Center since 1994. I am currently board certified in Emergency Medicine with sub-specialty board certification in Medical Toxicology. I presently maintain a consulting service for medical toxicology at LSUHSC-Shreveport and am consulted routinely by physicians throughout the state of Louisiana regarding management of patients with drug and toxin related problems. As a Medical Toxicologist, questions of drug, toxin and chemical exposures are commonly encountered. Per your request, I have reviewed the materials noted above in this case. Specifically, I have been asked to render an opinion regarding relative contribution of PCP and cocaine to the death of Mr. Ervin Edwards on November 26, 2013.

Thomas C. Arnold, MD – Medical Review

**Case History**

Mr. Ervin Edwards was involved in a disturbance at a gas station in West Baton Rouge Parish in the late afternoon hours of November 26, 2013. Officers from West Baton Rouge Parish Sheriff's Office responded and later called for assistance. Officers from the Port Allen Police Department responded. Mr. Edwards was reportedly combative and required restraint in order to be transported to the West Baton Rouge Detention Center. Officer reports note that Mr. Edwards was verbally and physically abusive during efforts to transport him and while placing him into an isolation cell. Multiple officers were required to remove all restraint devices from Mr. Edwards after being placed into the isolation cell. During this encounter Mr. Edwards was "drive stunned" with a Taser device for five seconds without noticeable effect. Shortly after removal of restraint devices Mr. Edwards was noted to be unresponsive. Cardio-pulmonary resuscitative efforts were begun and continued until EMS arrival but these proved to be unsuccessful. Autopsy revealed both cocaine (68 ng/mL) and phencyclidine (PCP 160 ng/mL) in Mr. Edward's blood at the time of death. No other cause or mechanism of death was identified.

**Opinion**

Cocaine is a potent central nervous system stimulant drug known to cause hypertension, tachycardia and violent behavior. The autopsy finding of cocaine in the blood suggests very recent use by Mr. Edwards. With a half-life of roughly one hour, it is likely Mr. Edwards had used cocaine within a few hours of the incident. He undoubtedly would have been considered "under the influence" of cocaine at the time of his arrest.

PCP is classified as a hallucinogen or dissociative agent. It has been associated a wide range of behaviors including extreme paranoia, combativeness, violence and seizures. The level of PCP in the blood of Mr. Edwards of 160 ng/mL is consistent with reports of in-custody deaths associated with PCP alone. The timing of the ingestion of PCP cannot be made precisely, but at the level noted at

Thomas C. Arnold, MD – Medical Review

the time of death, there is no question Mr. Edwards would have been experiencing the effects of PCP and considered under the influence.

The combination of cocaine and PCP would likely have had a cumulative effect on Mr. Edwards. Active psychomotor agitation combined with a hallucinogenic dissociative state undoubtedly led to the irrational and aggressive behavior he exhibited that evening.

The clinical situation described in the records noted above fit precisely into the description of an in-custody death associated with a condition called "Excited Delirium Syndrome" (ExDS). Excited Delirium has been recognized for many years. Fatal outcomes with ExDS are usually associated with two groups of individuals. It is most commonly associated with use of drug stimulants such as cocaine, methamphetamines, PCP and LSD. The second largest group is patients suffering from severe psychiatric illness. ExDS patients exhibit an increased pain tolerance, rapid respirations, sweating, agitation and hyperthermia. A typical case of death after ExDS involves young adult males exhibiting aggressive and bizarre behavior. Patients are combative and require physical and chemical restraint measures. Death generally follows suddenly after a violent struggle. Both cocaine and PCP have been associated with ExDS individually. The combination of these two drugs of abuse without question was sufficient to predispose Mr. Edwards to experience this syndrome.

**Conclusion**

It is with a high degree of confidence that I conclude that in the absence of PCP and cocaine use, Mr. Edwards would not have suffered the behavioral effects and the ExDS that led to his death. These drugs unquestionably set up the physiologic conditions leading to his untimely death. Had he not been under the influence of cocaine and PCP on that evening, more likely than not, he would be alive today. Further I find no evidence to conclude that Mr. Edwards' death was a direct consequence of actions taken by the Port Allen Police Department.

The opinion stated above is based upon my education, training & experience and is rendered with a high degree of medial certainty after review of the listed

Thomas C. Arnold, MD – Medical Review

materials. I reserve the right to modify this opinion if additional material or facts
are brought forward.

Sincerely,

Thomas C. Arnold, MD

W. Lloyd Grafton
March 26, 2015

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | MIDDLE DISTRICT OF LOUISIANA |
| 3 | |
| 4 | TRACEY LEWIS, IN HER CAPACITY   *   CIVIL ACTION |
| 5 | AS NATURAL TUTRIX AND ON        *   NO. 13-777- |
| 6 | BEHALF OF HER MINOR CHILD, E.E. *   JWD-SCR |
| 7 | (HEIR TO ERVIN EDWARDS)         * |
| 8 | * |
| 9 | versus                         * |
| 10 | * |
| 11 | SHERIFF MIKE CAZES, ET AL       * |
| 12 | *   *   *   *   *   *   *   *   *   *   *   * |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 |         Deposition of W. LLOYD GRAFTON, 3896 |
| 19 | Highway 33, Ruston, Louisiana 71270, taken in |
| 20 | the offices of Donna Grodner & Associates, 2223 |
| 21 | Quail Run, B-1, Baton Rouge, Louisiana 70808, on |
| 22 | Thursday, the 26th day of March, 2015, |
| 23 | commencing at 12:59 p.m. |
| 24 | |
| 25 | |

EXHIBIT
G
ALL-STATE LEGAL®

Baton Rouge Court Reporters, LLC
225-292-8686

ORIGINAL

W. Lloyd Grafton
March 26, 2015

86

1      Q.    I mean, I'm not quibbling with you.
2  We can argue whether or not he was banging his
3  head.  But we know that if he purposely was
4  hitting his head into the window and we know he
5  did it at least once, then it's appropriate for
6  the police to move him, correct?
7      MS. GRODNER:
8            Objection.  Misstates his prior
9  testimony.
10      A.    Right.  I have no issue with the
11  police moving him for safety purposes.
12  EXAMINATION BY MR. JAKUBACK:
13      Q.    And then as far as the movement of
14  him, the way they moved him as far as taking
15  their hands and moving with him and walking to
16  the next room, was that excessive force?
17      A.    No.
18      Q.    Okay.  Your Opinion No. 2 says:  As
19  a matter of policy and procedure, force may only
20  be used in accordance with the force continuum.
21  Using force where none was needed was a
22  violation of policy.
23            Where is that?  What is No. 2?  I'm
24  not really sure I understand where that
25  occurred.

W. Lloyd Grafton
March 26, 2015

102

```
 1        Q.    I'm not saying what they did is
 2   appropriate in your opinion.  But in order to do
 3   the appropriate thing, they have to take the
 4   restraints -- they have to take the cuffs off
 5   his hands and the restraints off his legs,
 6   correct?
 7        MS. GRODNER:
 8             Objection.  Compound.  Assumes facts
 9   not in evidence.
10        MR. JAKUBACK:
11             That's a great objection.  So let me
12   do this, because I know it's impossible for him
13   to answer that question as a compound question.
14   EXAMINATION BY MR. JAKUBACK:
15        Q.    I'll break it up for you.  When he
16   is brought in to isolation, is it appropriate
17   for them to take the handcuffs off of him?
18        A.    Yes.
19        Q.    Is it also appropriate for them to
20   take the leg restraints off of him?
21        A.    Yes.
22        Q.    In fact, they have to do so in order
23   to leave him in the isolation cell?
24        A.    Right.  You wouldn't leave him face
25   down cuffed and restrained.
```

W. Lloyd Grafton
March 26, 2015

191

```
 1              REPORTER'S CERTIFICATE
 2         I, Lisa Bode, Certified Court Reporter in
 3    and for the State of Louisiana, as the officer
 4    before whom this testimony was taken, do hereby
 5    certify that W. LLOYD GRAFTON, after having been
 6    duly sworn by me upon authority of R.S. 37:2554,
 7    did testify as hereinbefore set forth in the
 8    foregoing 190 pages; that this testimony was
 9    reported by me in the stenotype reporting
10    method, was prepared and transcribed by me or
11    under my personal direction and supervision, and
12    is a true and correct transcript to the best of
13    my ability and understanding; that the
14    transcript has been prepared in compliance with
15    transcript format guidelines required by statute
16    or by rules of the board, that I have acted in
17    compliance with the prohibition on contractual
18    relationships, as defined by Louisiana Code of
19    Civil Procedure Article 1434 and in rules and
20    advisory opinions of the board; that I am not
21    related to counsel or to the parties herein, nor
22    am I otherwise interested in the outcome of this
23    matter.
24                        Lisa Bode
                   _____
25                 Lisa Bode, CCR (#88002)
```

Baton Rouge Court Reporters, LLC
225-292-8686

# Port Allen Police Department
## Use Of Force Report Form

P.O. Box 468
Port Allen, La. 70767

(TUESDAY)
Date: 11-26-2013          Time: 1823 Hrs.          File Number: 13-062235

Offender: _Ervin Leon Edwards_          Phone #: _UNK_  Hm.
Address: _____          _UNK_  Wk.
_Jennings La 70546_

Location of Incident: _1150 Northwest drive_     Type of Incident: _Assist other agency_
Charges: _____

Type of Force: _____ Chemical Weapon     _____ Impact Weapon
               __✓__ Taser                _____ Other

Amount of Force used(# of strikes, duration of time until control gained, etc.):
_____
_____

Effects of Force Used: _____ Immobilized Offender     _____ Limited Effect
                       __✓__ No Effect

Offender under influence or suspected influence of alcohol or drugs? _Yes_

First aid needed? _____ Yes    __✓__ No Transported to hospital? _No_
Injury(s) to Offender: _NONE_
Officer(s) Injured? _____ Yes    __✓__ No    Photos taken: _____ Yes __✓__ No

Officers Involved(Name, Dept., Badge#): _PA-8 "McMullen" PA-3 "Williams"_
_WBR 31 "Arceneaux" WBR 36 "Austin" "SGT Hick WBR Jailer" "Corporal Alexander WBR Jailer"_
_____

Witness(s) (Name, Phone#): _NONE_
_____

Officer: _Dustin McMullen PA-8_ (Print)     _____ 
         _Dustin McMullen PA8_ (Sign)       Supervisor



EXHIBIT
H

Port Allen0009

McMullen, Dustin (PA-8)
PAPD FILE #13-002235 (SEE PAGE 5)

Page 1 of 14



PROTECT LIFE

| TASER Information | | Downloaded By | |
|---|---|---|---|
| Serial # | X00-232544 | Name | ANDREW ARRAZATTEE |
| Model # | X26 | Dept | Port Allen PD |
| X26 Software Version | 22 | Rank | OFFICER |
| Dataport CD Version | 17.9 | Windows Version | Windows XP |
| Record Date Range | All Data | | |
| Computer Time Zone | Central Standard Time *DST | Report Generated | 01/17/14 09:19:17 (local) |
| Using Daylight Savings Time | Yes | | |

**Recorded Firing Data**

| Seq | GMT Time | Local Time | Duration | Temp | Battery |
|---|---|---|---|---|---|
| 0001 | 08/03/12 18:03:14 | 08/03/12 13:03:14 | 1 | 35 | 99 |
| 0002 | 08/03/12 20:59:06 | 08/03/12 15:59:06 | 4 | 34 | 99 |
| 0003 | 08/03/12 21:00:33 | 08/03/12 16:00:33 | 1 | 34 | 58 |
| 0004 | 08/03/12 21:02:44 | 08/03/12 16:02:44 | 1 | 34 | 99 |
| 0005 | 08/03/12 21:02:46 | 08/03/12 16:02:46 | 1 | 34 | 99 |
| 0006 | 08/03/12 21:03:09 | 08/03/12 16:03:09 | 1 | 35 | 99 |
| 0007 | 08/03/12 21:03:11 | 08/03/12 16:03:11 | 2 | 35 | 99 |
| 0008 | 08/03/12 21:03:13 | 08/03/12 16:03:13 | 1 | 34 | 98 |
| 0009 | 08/03/12 21:03:14 | 08/03/12 16:03:14 | 1 | 35 | 98 |
| 0010 | 08/03/12 21:07:31 | 08/03/12 16:07:31 | 5 | 35 | 99 |
| 0011 | 08/05/12 17:14:39 | 08/05/12 12:14:39 | 4 | 34 | 99 |
| 0012 | 08/18/12 14:16:23 | 08/18/12 09:16:23 | 5 | 34 | 99 |
| 0013 | 09/11/12 14:07:51 | 09/11/12 09:07:51 | 1 | 31 | 99 |
| 0014 | 09/11/12 14:10:00 | 09/11/12 09:10:00 | 1 | 29 | 99 |

about:blank

**EXHIBIT**

**I**

ALL-STATE LEGAL®

1/17/2014

Port Allen0168

| | | | | | |
|---|---|---|---|---|---|
| 0015 | 09/25/12 16:04:51 | 09/25/12 11:04:51 | 1 | 33 | 99 |
| 0016 | 09/29/12 19:37:57 | 09/29/12 14:37:57 | 5 | 34 | 99 |
| 0017 | 09/29/12 19:38:45 | 09/29/12 14:38:45 | 5 | 36 | 98 |
| 0018 | 10/18/12 19:02:48 | 10/18/12 14:02:48 | 2 | 32 | 98 |
| 0019 | 10/18/12 19:02:55 | 10/18/12 14:02:55 | 4 | 33 | 98 |
| 0020 | 10/23/12 18:40:20 | 10/23/12 13:40:20 | 3 | 33 | 97 |
| 0021 | 10/23/12 18:42:29 | 10/23/12 13:42:29 | 5 | 35 | 97 |
| 0022 | 11/19/12 21:59:33 | 11/19/12 15:59:33 | 5 | 33 | 97 |
| 0023 | 12/08/12 17:28:19 | 12/08/12 11:28:19 | 2 | 32 | 96 |
| 0024 | 12/31/12 21:34:39 | 12/31/12 15:34:39 | 2 | 29 | 99 |
| 0025 | 03/28/13 12:41:21 | 03/28/13 07:41:21 | 5 | 14 | 99 |
| 0026 | 03/28/13 16:47:57 | 03/28/13 11:47:57 | 2 | 24 | 99 |
| 0027 | 03/28/13 16:49:04 | 03/28/13 11:49:04 | 2 | 24 | 99 |
| 0028 | 03/28/13 16:49:18 | 03/28/13 11:49:18 | 2 | 24 | 99 |
| 0029 | 03/28/13 16:49:35 | 03/28/13 11:49:35 | 2 | 24 | 99 |
| 0030 | 03/28/13 16:49:48 | 03/28/13 11:49:48 | 3 | 25 | 99 |
| 0031 | 03/28/13 16:50:40 | 03/28/13 11:50:40 | 2 | 25 | 99 |
| 0032 | 03/28/13 16:50:52 | 03/28/13 11:50:52 | 2 | 25 | 99 |
| 0033 | 03/28/13 16:52:23 | 03/28/13 11:52:23 | 2 | 25 | 99 |
| 0034 | 03/28/13 16:52:34 | 03/28/13 11:52:34 | 3 | 26 | 99 |
| 0035 | 03/28/13 16:52:44 | 03/28/13 11:52:44 | 2 | 25 | 99 |
| 0036 | 03/28/13 16:52:58 | 03/28/13 11:52:58 | 2 | 25 | 98 |
| 0037 | 03/28/13 16:53:07 | 03/28/13 11:53:07 | 2 | 25 | 98 |
| 0038 | 03/28/13 16:53:27 | 03/28/13 11:53:27 | 2 | 25 | 98 |
| 0039 | 03/28/13 16:53:36 | 03/28/13 11:53:36 | 2 | 26 | 98 |
| 0040 | 04/01/13 16:09:58 | 04/01/13 11:09:58 | 4 | 28 | 99 |
| 0041 | 04/01/13 16:47:01 | 04/01/13 11:47:01 | 5 | 28 | 99 |
| 0042 | 05/01/13 14:02:46 | 05/01/13 09:02:46 | 2 | 29 | 99 |
| 0043 | 05/01/13 14:13:58 | 05/01/13 09:13:58 | 5 | 30 | 99 |
| 0044 | 07/02/13 16:14:33 | 07/02/13 11:14:33 | 5 | 27 | 99 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 07/02/13 16:20:32 | 07/02/13 11:20:32 | 2 | 30 | 98 |
| 0046 | 07/02/13 18:18:21 | 07/02/13 13:18:21 | 1 | 28 | 98 |
| 0047 | 07/03/13 05:00:30 | 07/03/13 00:00:30 | 1 | 35 | 98 |
| 0048 | 07/03/13 09:07:50 | 07/03/13 04:07:50 | 2 | 32 | 98 |
| 0049 | 07/03/13 09:08:04 | 07/03/13 04:08:04 | 5 | 33 | 98 |
| 0050 | 07/03/13 21:24:18 | 07/03/13 16:24:18 | 1 | 30 | 97 |
| 0051 | 07/05/13 21:39:28 | 07/05/13 16:39:28 | 1 | 32 | 97 |
| 0052 | 07/06/13 08:34:50 | 07/06/13 03:34:50 | 1 | 31 | 97 |
| 0053 | 07/07/13 22:56:53 | 07/07/13 17:56:53 | 1 | 34 | 97 |
| 0054 | 07/08/13 01:17:59 | 07/07/13 20:17:59 | 1 | 33 | 97 |
| 0055 | 07/11/13 03:11:16 | 07/10/13 22:11:16 | 1 | 34 | 97 |
| 0056 | 07/11/13 03:11:20 | 07/10/13 22:11:20 | 1 | 33 | 97 |
| 0057 | 07/12/13 01:16:59 | 07/11/13 20:16:59 | 1 | 31 | 97 |
| 0058 | 07/12/13 02:24:39 | 07/11/13 21:24:39 | 1 | 34 | 97 |
| 0059 | 07/12/13 03:01:06 | 07/11/13 22:01:06 | 1 | 34 | 96 |
| 0060 | 07/14/13 04:24:39 | 07/13/13 23:24:39 | 1 | 33 | 96 |
| 0061 | 07/15/13 03:39:15 | 07/14/13 22:39:15 | 1 | 33 | 96 |
| 0062 | 07/15/13 20:14:25 | 07/15/13 15:14:25 | 1 | 26 | 96 |
| 0063 | 07/16/13 05:32:59 | 07/16/13 00:32:59 | 1 | 31 | 99 |
| 0064 | 07/16/13 05:33:02 | 07/16/13 00:33:02 | 1 | 32 | 99 |
| 0065 | 07/17/13 04:18:42 | 07/16/13 23:18:42 | 1 | 33 | 99 |
| 0066 | 07/19/13 01:06:01 | 07/18/13 20:06:01 | 1 | 34 | 99 |
| 0067 | 07/19/13 03:45:22 | 07/18/13 22:45:22 | 1 | 31 | 99 |
| 0068 | 07/19/13 07:26:25 | 07/19/13 02:26:25 | 1 | 34 | 99 |
| 0069 | 07/24/13 18:42:42 | 07/24/13 13:42:42 | 1 | 26 | 99 |
| 0070 | 07/24/13 23:34:02 | 07/24/13 18:34:02 | 5 | 40 | 99 |
| 0071 | 07/25/13 00:58:20 | 07/24/13 19:58:20 | 3 | 36 | 99 |
| 0072 | 07/25/13 21:21:10 | 07/25/13 16:21:10 | 1 | 34 | 99 |
| 0073 | 07/28/13 04:30:19 | 07/27/13 23:30:19 | 1 | 29 | 99 |
| 0074 | 07/28/13 06:35:08 | 07/28/13 01:35:08 | 1 | 34 | 99 |

about:blank

1/17/2014

Port Allen0170

|      | | | | | |
|------|-----------------|-----------------|---|----|----|
|      | 07/30/13 00:15:57 | 07/29/13 19:15:57 | 1 | 34 | 99 |
| 0076 | 07/31/13 07:44:32 | 07/31/13 02:44:32 | 1 | 28 | 99 |
| 0077 | 07/31/13 08:10:14 | 07/31/13 03:10:14 | 1 | 31 | 99 |
| 0078 | 08/04/13 06:30:56 | 08/04/13 01:30:56 | 1 | 34 | 99 |
| 0079 | 08/04/13 06:34:17 | 08/04/13 01:34:17 | 1 | 34 | 99 |
| 0080 | 08/07/13 02:29:58 | 08/06/13 21:29:58 | 1 | 34 | 99 |
| 0081 | 08/07/13 22:00:56 | 08/07/13 17:00:56 | 5 | 39 | 99 |
| 0082 | 08/08/13 01:47:26 | 08/07/13 20:47:26 | 2 | 34 | 98 |
| 0083 | 08/08/13 04:09:47 | 08/07/13 23:09:47 | 2 | 36 | 99 |
| 0084 | 08/12/13 22:01:00 | 08/12/13 17:01:00 | 1 | 34 | 99 |
| 0085 | 08/12/13 22:01:24 | 08/12/13 17:01:24 | 2 | 34 | 99 |
| 0086 | 08/14/13 00:07:45 | 08/13/13 19:07:45 | 1 | 33 | 99 |
| 0087 | 08/14/13 04:59:35 | 08/13/13 23:59:35 | 3 | 32 | 99 |
| 0088 | 08/15/13 05:12:25 | 08/15/13 00:12:25 | 1 | 32 | 99 |
| 0089 | 08/15/13 21:32:47 | 08/15/13 16:32:47 | 3 | 35 | 99 |
| 0090 | 08/17/13 06:38:35 | 08/17/13 01:38:35 | 4 | 32 | 98 |
| 0091 | 08/27/13 03:36:58 | 08/26/13 22:36:58 | 3 | 34 | 98 |
| 0092 | 09/05/13 07:22:02 | 09/05/13 02:22:02 | 2 | 32 | 98 |
| 0093 | 09/06/13 03:25:51 | 09/05/13 22:25:51 | 2 | 34 | 98 |
| 0094 | 09/09/13 22:17:53 | 09/09/13 17:17:53 | 5 | 34 | 97 |
| 0095 | 09/13/13 22:49:33 | 09/13/13 17:49:33 | 2 | 36 | 97 |
| 0096 | 09/13/13 22:50:16 | 09/13/13 17:50:16 | 1 | 37 | 97 |
| 0097 | 09/13/13 22:50:18 | 09/13/13 17:50:18 | 1 | 37 | 97 |
| 0098 | 09/18/13 22:01:25 | 09/18/13 17:01:25 | 5 | 37 | 97 |
| 0099 | 09/19/13 22:00:44 | 09/19/13 17:00:44 | 5 | 33 | 96 |
| 0100 | 09/22/13 00:13:54 | 09/21/13 19:13:54 | 5 | 33 | 96 |
| 0101 | 09/24/13 05:35:59 | 09/24/13 00:35:59 | 5 | 31 | 96 |
| 0102 | 09/25/13 00:28:52 | 09/24/13 19:28:52 | 3 | 32 | 95 |
| 0103 | 09/28/13 02:50:02 | 09/27/13 21:50:02 | 5 | 33 | 95 |
| 0104 | 10/04/13 04:44:39 | 10/03/13 23:44:39 | 5 | 32 | 95 |

Port Allen0171

|       |                   |                   |           |    |    |   |
|-------|-------------------|-------------------|-----------|----|----|---|
|       | 10/12/13 10:02:37 | 10/12/13 05:02:37 | 5         | 31 | 94 |   |
| 0106  | 10/30/13 03:24:27 | 10/29/13 22:24:27 | 1         | 24 | 99 |   |
| 0107  | 11/09/13 02:05:40 | 11/08/13 20:05:40 | 1         | 24 | 99 |   |
| 0108  | 11/16/13 05:29:07 | 11/15/13 23:29:07 | 2         | 25 | 99 |   |
| 0109  | 11/18/13 03:55:07 | 11/17/13 21:55:07 | 1         | 29 | 99 |   |
| 0110  | 11/26/13 01:23:16 | 11/25/13 19:23:16 | 5         | 29 | 99 | — |
| 0111  | 11/27/13 00:46:12 | 11/26/13 18:46:12 | 5         | 24 | 98 | — |
| 0112  | 01/01/00 15:11:23 | 01/01/00 09:11:23 | Old Time  |    |    |   |
| 0113  | 01/17/14 15:18:53 | 01/17/14 09:18:53 | New Time  |    |    |   |
| 0114  | 10/27/10 00:18:00 | 10/26/10 19:18:00 | 3         | 34 | 86 |   |
| 0115  | 11/04/10 00:50:39 | 11/03/10 19:50:39 | 1         | 24 | 86 |   |
| 0116  | 11/04/10 01:00:19 | 11/03/10 20:00:19 | 2         | 27 | 85 |   |
| 0117  | 11/09/10 15:23:33 | 11/09/10 09:23:33 | 1         | 28 | 85 |   |
| 0118  | 12/25/10 21:36:49 | 12/25/10 15:36:49 | 1         | 18 | 85 |   |
| 0119  | 12/25/10 21:36:54 | 12/25/10 15:36:54 | 1         | 19 | 85 |   |
| 0120  | 12/25/10 21:38:18 | 12/25/10 15:38:18 | 4         | 22 | 85 |   |
| 0121  | 12/25/10 21:38:26 | 12/25/10 15:38:26 | 4         | 23 | 84 |   |
| 0122  | 12/25/10 21:40:19 | 12/25/10 15:40:19 | 1         | 23 | 84 |   |
| 0123  | 12/25/10 21:40:35 | 12/25/10 15:40:35 | 3         | 24 | 84 |   |
| 0124  | 12/25/10 21:40:42 | 12/25/10 15:40:42 | 4         | 25 | 84 |   |
| 0125  | 12/25/10 21:43:13 | 12/25/10 15:43:13 | 5         | 28 | 83 |   |
| 0126  | 12/25/10 21:44:14 | 12/25/10 15:44:14 | 1         | 28 | 83 |   |
| 0127  | 12/25/10 21:44:19 | 12/25/10 15:44:19 | 2         | 29 | 83 |   |
| 0128  | 12/25/10 21:44:51 | 12/25/10 15:44:51 | 4         | 29 | 83 |   |
| 0129  | 12/25/10 21:45:30 | 12/25/10 15:45:30 | 3         | 29 | 83 |   |
| 0130  | 12/25/10 21:46:45 | 12/25/10 15:46:45 | 2         | 29 | 82 |   |
| 0131  | 12/25/10 21:46:52 | 12/25/10 15:46:52 | 2         | 29 | 82 |   |
| 0132  | 12/31/10 02:39:12 | 12/30/10 20:39:12 | 1         | 29 | 82 |   |
| 0133  | 01/04/11 22:56:06 | 01/04/11 16:56:06 | 2         | 27 | 82 |   |
| 0134  | 01/04/11 22:57:35 | 01/04/11 16:57:35 | 1         | 27 | 82 |   |

about:blank                                                          1/17/2014

Port Allen0172

| | | | | | |
|---|---|---|---|---|---|
| 0135 | 01/04/11 22:58:04 | 01/04/11 16:58:04 | 2 | 28 | 82 |
| 0136 | 01/04/11 22:58:41 | 01/04/11 16:58:41 | 5 | 29 | 82 |
| 0137 | 01/04/11 22:59:04 | 01/04/11 16:59:04 | 1 | 29 | 81 |
| 0138 | 01/04/11 22:59:45 | 01/04/11 16:59:45 | 5 | 30 | 81 |
| 0139 | 01/04/11 23:00:10 | 01/04/11 17:00:10 | 1 | 30 | 81 |
| 0140 | 01/04/11 23:01:42 | 01/04/11 17:01:42 | 1 | 31 | 81 |
| 0141 | 01/04/11 23:02:02 | 01/04/11 17:02:02 | 5 | 31 | 81 |
| 0142 | 01/04/11 23:02:23 | 01/04/11 17:02:23 | 5 | 32 | 80 |
| 0143 | 01/04/11 23:02:40 | 01/04/11 17:02:40 | 3 | 32 | 80 |
| 0144 | 01/04/11 23:04:22 | 01/04/11 17:04:22 | 2 | 33 | 80 |
| 0145 | 01/04/11 23:04:38 | 01/04/11 17:04:38 | 4 | 33 | 80 |
| 0146 | 01/04/11 23:04:48 | 01/04/11 17:04:48 | 4 | 33 | 79 |
| 0147 | 01/04/11 23:11:56 | 01/04/11 17:11:56 | 5 | 32 | 79 |
| 0148 | 01/04/11 23:12:07 | 01/04/11 17:12:07 | 2 | 32 | 79 |
| 0149 | 01/04/11 23:12:16 | 01/04/11 17:12:16 | 5 | 32 | 79 |
| 0150 | 01/13/11 20:55:08 | 01/13/11 14:55:08 | 2 | 23 | 78 |
| 0151 | 01/13/11 20:56:55 | 01/13/11 14:56:55 | 2 | 26 | 78 |
| 0152 | 01/13/11 20:58:45 | 01/13/11 14:58:45 | 1 | 27 | 78 |
| 0153 | 01/13/11 21:06:10 | 01/13/11 15:06:10 | 2 | 29 | 78 |
| 0154 | 01/13/11 21:08:21 | 01/13/11 15:08:21 | 2 | 29 | 78 |
| 0155 | 01/13/11 21:11:49 | 01/13/11 15:11:49 | 1 | 29 | 77 |
| 0156 | 01/13/11 21:16:16 | 01/13/11 15:16:16 | 2 | 29 | 77 |
| 0157 | 01/13/11 21:22:27 | 01/13/11 15:22:27 | 1 | 31 | 77 |
| 0158 | 01/14/11 20:22:54 | 01/14/11 14:22:54 | 5 | 23 | 77 |
| 0159 | 01/15/11 00:38:18 | 01/14/11 18:38:18 | 1 | 29 | 77 |
| 0160 | 01/15/11 00:38:49 | 01/14/11 18:38:49 | 2 | 30 | 77 |
| 0161 | 01/15/11 00:39:08 | 01/14/11 18:39:08 | 3 | 30 | 77 |
| 0162 | 01/15/11 00:50:21 | 01/14/11 18:50:21 | 2 | 29 | 76 |
| 0163 | 01/15/11 01:55:52 | 01/14/11 19:55:52 | 1 | 30 | 76 |
| 0164 | 01/15/11 01:56:56 | 01/14/11 19:56:56 | 3 | 31 | 76 |

Port Allen0173

|      | 01/15/11 01:57:42 | 01/14/11 19:57:42 | 1 | 31 | 76 |
|------|-------------------|-------------------|---|----|----|
| 0166 | 01/15/11 02:03:39 | 01/14/11 20:03:39 | 2 | 31 | 76 |
| 0167 | 01/15/11 02:03:46 | 01/14/11 20:03:46 | 1 | 31 | 76 |
| 0168 | 01/15/11 21:28:05 | 01/15/11 15:28:05 | 5 | 31 | 76 |
| 0169 | 01/15/11 21:29:02 | 01/15/11 15:29:02 | 1 | 32 | 75 |
| 0170 | 01/15/11 21:29:08 | 01/15/11 15:29:08 | 3 | 32 | 75 |
| 0171 | 01/15/11 21:30:31 | 01/15/11 15:30:31 | 1 | 31 | 75 |
| 0172 | 01/15/11 21:30:42 | 01/15/11 15:30:42 | 1 | 32 | 75 |
| 0173 | 01/15/11 21:30:50 | 01/15/11 15:30:50 | 1 | 32 | 75 |
| 0174 | 01/15/11 21:35:12 | 01/15/11 15:35:12 | 5 | 34 | 75 |
| 0175 | 01/15/11 21:35:49 | 01/15/11 15:35:49 | 2 | 34 | 74 |
| 0176 | 01/15/11 21:35:54 | 01/15/11 15:35:54 | 3 | 34 | 74 |
| 0177 | 05/30/11 00:48:29 | 05/29/11 19:48:29 | 5 | 30 | 73 |
| 0178 | 05/30/11 00:49:31 | 05/29/11 19:49:31 | 5 | 32 | 73 |
| 0179 | 05/30/11 00:49:41 | 05/29/11 19:49:41 | 5 | 32 | 72 |
| 0180 | 05/30/11 00:49:50 | 05/29/11 19:49:50 | 5 | 33 | 72 |
| 0181 | 08/06/11 18:12:02 | 08/06/11 13:12:02 | 1 | 41 | 71 |
| 0182 | 08/06/11 18:12:42 | 08/06/11 13:12:42 | 1 | 41 | 71 |
| 0183 | 04/04/12 15:52:23 | 04/04/12 10:52:23 | Old Time | | |
| 0184 | 04/04/12 16:12:55 | 04/04/12 11:12:55 | New Time | | |
| 0185 | 04/04/12 16:14:48 | 04/04/12 11:14:48 | 1 | 28 | 70 |
| 0186 | 08/03/12 17:59:38 | 08/03/12 12:59:38 | 1 | 32 | 69 |
| 0187 | 08/03/12 18:00:11 | 08/03/12 13:00:11 | 1 | 31 | 69 |
| 0188 | 08/03/12 18:00:37 | 08/03/12 13:00:37 | 1 | 33 | 69 |
| 0189 | | Invalid Date/Time | | | |
| 0190 | 12/02/07 05:13:52 | 12/01/07 23:13:52 | 1 | 26 | 98 |
| 0191 | 12/02/07 05:14:58 | 12/01/07 23:14:58 | 2 | 29 | 98 |
| 0192 | 12/05/07 02:33:52 | 12/04/07 20:33:52 | 2 | 28 | 98 |
| 0193 | 12/05/07 22:44:20 | 12/05/07 16:44:20 | 5 | 30 | 98 |
| 0194 | 12/10/07 04:39:11 | 12/09/07 22:39:11 | 1 | 33 | 97 |

Port Allen0174

| | | | | | |
|---|---|---|---|---|---|
| 0195 | 12/10/07 23:53:51 | 12/10/07 17:53:51 | 1 | 24 | 97 |
| 0196 | 12/12/07 00:05:15 | 12/11/07 18:05:15 | 1 | 24 | 97 |
| 0197 | 12/14/07 22:22:15 | 12/14/07 16:22:15 | 1 | 27 | 97 |
| 0198 | 12/16/07 21:26:10 | 12/16/07 15:26:10 | 1 | 24 | 97 |
| 0199 | 12/19/07 22:23:15 | 12/19/07 16:23:15 | 5 | 29 | 96 |
| 0200 | 12/21/07 05:43:08 | 12/20/07 23:43:08 | 1 | 25 | 95 |
| 0201 | 12/22/07 23:09:04 | 12/22/07 17:09:04 | 5 | 30 | 95 |
| 0202 | 12/24/07 02:56:24 | 12/23/07 20:56:24 | 2 | 26 | 95 |
| 0203 | 12/24/07 22:45:35 | 12/24/07 16:45:35 | 1 | 27 | 95 |
| 0204 | 12/25/07 21:44:31 | 12/25/07 15:44:31 | 1 | 24 | 94 |
| 0205 | 12/25/07 22:49:49 | 12/25/07 16:49:49 | 2 | 27 | 94 |
| 0206 | 12/26/07 02:04:14 | 12/25/07 20:04:14 | 5 | 29 | 94 |
| 0207 | 12/28/07 22:22:25 | 12/28/07 16:22:25 | 5 | 28 | 94 |
| 0208 | 12/31/07 08:57:11 | 12/31/07 02:57:11 | 2 | 30 | 92 |
| 0209 | 12/31/07 22:57:57 | 12/31/07 16:57:57 | 9 | 29 | 92 |
| 0210 | 01/02/08 09:38:18 | 01/02/08 03:38:18 | 1 | 29 | 91 |
| 0211 | 01/02/08 22:15:09 | 01/02/08 16:15:09 | 2 | 24 | 91 |
| 0212 | 01/03/08 20:27:14 | 01/03/08 14:27:14 | 5 | 24 | 91 |
| 0213 | 01/03/08 20:27:22 | 01/03/08 14:27:22 | 5 | 24 | 91 |
| 0214 | 01/04/08 12:01:28 | 01/04/08 06:01:28 | 2 | 31 | 90 |
| 0215 | 01/04/08 15:57:44 | 01/04/08 09:57:44 | 1 | 28 | 90 |
| 0216 | 01/04/08 21:57:49 | 01/04/08 15:57:49 | 1 | 29 | 90 |
| 0217 | 01/05/08 14:15:20 | 01/05/08 08:15:20 | 1 | 27 | 90 |
| 0218 | 01/05/08 17:44:49 | 01/05/08 11:44:49 | 1 | 29 | 90 |
| 0219 | 01/05/08 21:53:48 | 01/05/08 15:53:48 | 3 | 34 | 89 |
| 0220 | 01/06/08 20:18:02 | 01/06/08 14:18:02 | 1 | 34 | 89 |
| 0221 | 01/07/08 10:28:51 | 01/07/08 04:28:51 | 1 | 26 | 89 |
| 0222 | 01/09/08 22:16:58 | 01/09/08 16:16:58 | 5 | 24 | 89 |
| 0223 | 01/11/08 08:46:15 | 01/11/08 02:46:15 | 2 | 31 | 89 |
| 0224 | 01/15/08 20:21:54 | 01/15/08 14:21:54 | 1 | 32 | 88 |

Port Allen0175

|  | 01/23/08 14:48:54 | 01/23/08 08:48:54 | 2 | 24 | 88 |
| 0226 | 01/25/08 12:34:21 | 01/25/08 06:34:21 | 1 | 23 | 88 |
| 0227 | 01/26/08 12:06:27 | 01/26/08 06:06:27 | 1 | 28 | 88 |
| 0228 | 01/29/08 07:43:15 | 01/29/08 01:43:15 | 5 | 32 | 88 |
| 0229 | 01/29/08 07:43:22 | 01/29/08 01:43:22 | 4 | 33 | 87 |
| 0230 | 02/03/08 14:50:50 | 02/03/08 08:50:50 | 2 | 26 | 87 |
| 0231 | 02/04/08 21:54:55 | 02/04/08 15:54:55 | 1 | 26 | 87 |
| 0232 | 02/05/08 08:47:45 | 02/05/08 02:47:45 | 1 | 29 | 87 |
| 0233 | 02/05/08 21:23:05 | 02/05/08 15:23:05 | 1 | 31 | 87 |
| 0234 | 02/10/08 18:30:23 | 02/10/08 12:30:23 | 3 | 32 | 86 |
| 0235 | 02/14/08 22:15:20 | 02/14/08 16:15:20 | 5 | 28 | 86 |
| 0236 | 02/21/08 22:30:08 | 02/21/08 16:30:08 | 1 | 31 | 83 |
| 0237 | 03/07/08 22:17:56 | 03/07/08 16:17:56 | 2 | 23 | 82 |
| 0238 | 03/08/08 03:36:40 | 03/07/08 21:36:40 | 5 | 22 | 82 |
| 0239 | 03/19/08 20:05:37 | 03/19/08 15:05:37 | 5 | 26 | 78 |
| 0240 | 03/19/08 20:32:42 | 03/19/08 15:32:42 | 2 | 29 | 78 |
| 0241 | 03/21/08 21:17:35 | 03/21/08 16:17:35 | 1 | 23 | 78 |
| 0242 | 04/03/08 03:29:50 | 04/02/08 22:29:50 | 3 | 32 | 77 |
| 0243 | 04/03/08 03:30:05 | 04/02/08 22:30:05 | 1 | 31 | 77 |
| 0244 | 04/06/08 18:19:35 | 04/06/08 13:19:35 | 2 | 32 | 77 |
| 0245 | 04/06/08 18:19:52 | 04/06/08 13:19:52 | 2 | 33 | 77 |
| 0246 | 04/15/08 20:51:12 | 04/15/08 15:51:12 | 1 | 30 | 76 |
| 0247 | 04/18/08 21:35:46 | 04/18/08 16:35:46 | 2 | 24 | 76 |
| 0248 | 04/23/08 12:29:30 | 04/23/08 07:29:30 | 1 | 29 | 75 |
| 0249 | 04/24/08 14:32:17 | 04/24/08 09:32:17 | 1 | 33 | 75 |
| 0250 | 05/03/08 14:09:10 | 05/03/08 09:09:10 | 4 | 30 | 74 |
| 0251 | 05/07/08 21:58:00 | 05/07/08 16:58:00 | 1 | 33 | 74 |
| 0252 | 05/16/08 18:43:57 | 05/16/08 13:43:57 | 1 | 31 | 73 |
| 0253 | 05/27/08 20:26:48 | 05/27/08 15:26:48 | 3 | 38 | 73 |
| 0254 | 05/27/08 20:27:13 | 05/27/08 15:27:13 | 4 | 38 | 73 |

Port Allen0176

|      |                   |                   |    |    |    |
|------|-------------------|-------------------|----|----|----|
|      | 06/01/08 18:07:25 | 06/01/08 13:07:25 | 1  | 33 | 73 |
| 0256 | 06/01/08 18:07:32 | 06/01/08 13:07:32 | 1  | 34 | 73 |
| 0257 | 06/15/08 11:54:21 | 06/15/08 06:54:21 | 2  | 32 | 72 |
| 0258 | 06/19/08 20:20:15 | 06/19/08 15:20:15 | 1  | 29 | 72 |
| 0259 | 06/24/08 20:42:24 | 06/24/08 15:42:24 | 5  | 26 | 72 |
| 0260 | 07/02/08 21:51:13 | 07/02/08 16:51:13 | 1  | 23 | 71 |
| 0261 | 07/16/08 17:24:23 | 07/16/08 12:24:23 | 5  | 28 | 71 |
| 0262 | 07/17/08 20:17:35 | 07/17/08 15:17:35 | 5  | 28 | 70 |
| 0263 | 07/21/08 20:53:13 | 07/21/08 15:53:13 | 1  | 24 | 70 |
| 0264 | 07/22/08 20:24:11 | 07/22/08 15:24:11 | 1  | 33 | 70 |
| 0265 | 07/22/08 20:38:07 | 07/22/08 15:38:07 | 5  | 37 | 70 |
| 0266 | 07/23/08 00:38:33 | 07/22/08 19:38:33 | 5  | 32 | 69 |
| 0267 | 07/23/08 00:38:48 | 07/22/08 19:38:48 | 12 | 34 | 69 |
| 0268 | 07/23/08 00:59:01 | 07/22/08 19:59:01 | 5  | 31 | 68 |
| 0269 | 07/23/08 01:00:41 | 07/22/08 20:00:41 | 2  | 33 | 68 |
| 0270 | 07/23/08 01:02:30 | 07/22/08 20:02:30 | 1  | 32 | 67 |
| 0271 | 07/23/08 01:02:34 | 07/22/08 20:02:34 | 3  | 33 | 67 |
| 0272 | 07/23/08 01:02:37 | 07/22/08 20:02:37 | 2  | 33 | 67 |
| 0273 | 07/23/08 01:02:42 | 07/22/08 20:02:42 | 2  | 33 | 67 |
| 0274 | 07/23/08 01:06:00 | 07/22/08 20:06:00 | 2  | 33 | 67 |
| 0275 | 07/23/08 01:10:25 | 07/22/08 20:10:25 | 2  | 34 | 67 |
| 0276 | 07/23/08 01:11:02 | 07/22/08 20:11:02 | 2  | 34 | 67 |
| 0277 | 07/23/08 01:11:43 | 07/22/08 20:11:43 | 1  | 34 | 67 |
| 0278 | 07/23/08 01:25:01 | 07/22/08 20:25:01 | 2  | 34 | 67 |
| 0279 | 07/23/08 20:38:38 | 07/23/08 15:38:38 | 1  | 31 | 67 |
| 0280 | 07/24/08 22:39:45 | 07/24/08 17:39:45 | 4  | 34 | 67 |
| 0281 | 07/26/08 01:22:02 | 07/25/08 20:22:02 | 2  | 33 | 66 |
| 0282 | 07/26/08 03:13:19 | 07/25/08 22:13:19 | 1  | 30 | 66 |
| 0283 | 07/26/08 20:26:50 | 07/26/08 15:26:50 | 1  | 34 | 66 |
| 0284 | 07/26/08 21:28:18 | 07/26/08 16:28:18 | 1  | 30 | 66 |

Port Allen0177

|      |                   |                   |   |    |    |
|------|-------------------|-------------------|---|----|----|
|      | 08/01/08 01:47:44 | 07/31/08 20:47:44 | 1 | 31 | 66 |
| 0286 | 08/04/08 03:42:50 | 08/03/08 22:42:50 | 1 | 34 | 65 |
| 0287 | 08/04/08 21:54:36 | 08/04/08 16:54:36 | 1 | 25 | 65 |
| 0288 | 08/08/08 23:35:35 | 08/08/08 18:35:35 | 1 | 30 | 65 |
| 0289 | 08/09/08 20:59:16 | 08/09/08 15:59:16 | 3 | 32 | 65 |
| 0290 | 08/09/08 20:59:54 | 08/09/08 15:59:54 | 1 | 32 | 65 |
| 0291 | 08/09/08 20:59:55 | 08/09/08 15:59:55 | 1 | 32 | 65 |
| 0292 | 08/09/08 20:59:56 | 08/09/08 15:59:56 | 1 | 32 | 65 |
| 0293 | 08/11/08 21:02:02 | 08/11/08 16:02:02 | 3 | 32 | 64 |
| 0294 | 08/12/08 05:17:32 | 08/12/08 00:17:32 | 2 | 31 | 64 |
| 0295 | 08/22/08 21:58:07 | 08/22/08 16:58:07 | 1 | 24 | 64 |
| 0296 | 08/30/08 02:48:43 | 08/29/08 21:48:43 | 1 | 24 | 64 |
| 0297 | 09/02/08 23:52:01 | 09/02/08 18:52:01 | 1 | 31 | 64 |
| 0298 | 09/02/08 23:52:06 | 09/02/08 18:52:06 | 2 | 31 | 64 |
| 0299 | 09/04/08 04:10:17 | 09/03/08 23:10:17 | 2 | 31 | 64 |
| 0300 | 09/17/08 01:38:19 | 09/16/08 20:38:19 | 1 | 29 | 63 |
| 0301 | 09/19/08 21:09:16 | 09/19/08 16:09:16 | 1 | 31 | 63 |
| 0302 | 09/19/08 23:06:27 | 09/19/08 18:06:27 | 1 | 31 | 63 |
| 0303 | 09/20/08 21:04:46 | 09/20/08 16:04:46 | 1 | 32 | 63 |
| 0304 | 09/30/08 21:01:28 | 09/30/08 16:01:28 | 1 | 31 | 62 |
| 0305 | 10/08/08 21:28:12 | 10/08/08 16:28:12 | 5 | 24 | 62 |
| 0306 | 10/17/08 19:47:32 | 10/17/08 14:47:32 | 2 | 27 | 62 |
| 0307 | 10/19/08 23:23:00 | 10/19/08 18:23:00 | 1 | 29 | 62 |
| 0308 | 10/23/08 20:50:46 | 10/23/08 15:50:46 | 5 | 27 | 62 |
| 0309 | 10/24/08 02:41:40 | 10/23/08 21:41:40 | 4 | 31 | 61 |
| 0310 | 10/24/08 06:31:59 | 10/24/08 01:31:59 | 6 | 29 | 61 |
| 0311 | 10/30/08 22:49:12 | 10/30/08 17:49:12 | 1 | 24 | 61 |
| 0312 | 11/02/08 05:42:02 | 11/02/08 00:42:02 | 1 | 27 | 60 |
| 0313 | 11/08/08 06:18:17 | 11/08/08 00:18:17 | 1 | 26 | 60 |
| 0314 | 11/09/08 09:00:34 | 11/09/08 03:00:34 | 1 | 29 | 59 |

Port Allen0178

|      |                     |                     |     |     |     |
| ---- | ------------------- | ------------------- | --- | --- | --- |
|      | 11/14/08 05:37:58   | 11/13/08 23:37:58   | 1   | 27  | 59  |
| 0316 | 11/15/08 16:50:18   | 11/15/08 10:50:18   | 5   | 24  | 59  |
| 0317 | 11/16/08 04:24:05   | 11/15/08 22:24:05   | 1   | 27  | 59  |
| 0318 | 11/19/08 05:53:53   | 11/18/08 23:53:53   | 1   | 30  | 58  |
| 0319 | 12/13/08 02:10:52   | 12/12/08 20:10:52   | 1   | 29  | 58  |
| 0320 | 12/19/08 17:05:24   | 12/19/08 11:05:24   | 1   | 31  | 58  |
| 0321 | 12/19/08 19:03:43   | 12/19/08 13:03:43   | 1   | 31  | 58  |
| 0322 | 12/21/08 18:35:04   | 12/21/08 12:35:04   | 2   | 29  | 58  |
| 0323 | 12/29/08 19:37:23   | 12/29/08 13:37:23   | 5   | 31  | 57  |
| 0324 | 12/30/08 17:17:49   | 12/30/08 11:17:49   | 1   | 27  | 57  |
| 0325 | 01/04/09 00:39:40   | 01/03/09 18:39:40   | 1   | 31  | 57  |
| 0326 | 01/05/09 03:48:58   | 01/04/09 21:48:58   | 3   | 34  | 57  |
| 0327 | 01/08/09 16:18:26   | 01/08/09 10:18:26   | 1   | 26  | 53  |
| 0328 | 01/09/09 22:08:26   | 01/09/09 16:08:26   | 2   | 23  | 53  |
| 0329 | 01/11/09 02:13:30   | 01/10/09 20:13:30   | 5   | 29  | 53  |
| 0330 | 01/12/09 04:25:50   | 01/11/09 22:25:50   | 1   | 18  | 52  |
| 0331 | 01/13/09 22:20:32   | 01/13/09 16:20:32   | 5   | 28  | 52  |
| 0332 | 01/19/09 22:14:27   | 01/19/09 16:14:27   | 5   | 28  | 52  |
| 0333 | 01/20/09 22:50:56   | 01/20/09 16:50:56   | 2   | 19  | 51  |
| 0334 | 02/02/09 22:04:06   | 02/02/09 16:04:06   | 1   | 27  | 51  |
| 0335 | 02/03/09 20:48:10   | 02/03/09 14:48:10   | 1   | 20  | 51  |
| 0336 | 02/03/09 22:07:38   | 02/03/09 16:07:38   | 1   | 27  | 51  |
| 0337 | 02/04/09 22:57:09   | 02/04/09 16:57:09   | 1   | 25  | 51  |
| 0338 | 02/06/09 22:25:00   | 02/06/09 16:25:00   | 3   | 25  | 51  |
| 0339 | 02/07/09 06:28:57   | 02/07/09 00:28:57   | 9   | 32  | 51  |
| 0340 | 02/07/09 06:29:25   | 02/07/09 00:29:25   | 28  | 34  | 50  |
| 0341 | 02/08/09 00:13:51   | 02/07/09 18:13:51   | 8   | 32  | 48  |
| 0342 | 02/11/09 22:00:14   | 02/11/09 16:00:14   | 1   | 24  | 47  |
| 0343 | 02/11/09 22:21:50   | 02/11/09 16:21:50   | 5   | 27  | 47  |
| 0344 | 02/20/09 22:58:51   | 02/20/09 16:58:51   | 2   | 26  | 46  |

Port Allen0179

|      |                     |                     |   |    |    |
|------|---------------------|---------------------|---|----|----|
|      | 02/25/09 22:28:38   | 02/25/09 16:28:38   | 1 | 29 | 46 |
| 0346 | 03/06/09 09:57:34   | 03/06/09 03:57:34   | 1 | 24 | 46 |
| 0347 | 03/07/09 09:33:21   | 03/07/09 03:33:21   | 1 | 28 | 46 |
| 0348 | 03/07/09 13:50:01   | 03/07/09 07:50:01   | 1 | 27 | 46 |
| 0349 | 03/08/09 08:34:34   | 03/08/09 03:34:34   | 1 | 28 | 46 |
| 0350 | 03/08/09 14:58:50   | 03/08/09 09:58:50   | 5 | 34 | 45 |
| 0351 | 03/08/09 20:20:37   | 03/08/09 15:20:37   | 1 | 30 | 45 |
| 0352 | 03/08/09 21:34:06   | 03/08/09 16:34:06   | 1 | 25 | 45 |
| 0353 | 03/10/09 21:30:25   | 03/10/09 16:30:25   | 3 | 28 | 45 |
| 0354 | 03/11/09 19:53:05   | 03/11/09 14:53:05   | 1 | 23 | 45 |
| 0355 | 03/11/09 19:53:41   | 03/11/09 14:53:41   | 1 | 23 | 45 |
| 0356 | 03/12/09 00:59:49   | 03/11/09 19:59:49   | 1 | 31 | 45 |
| 0357 | 03/12/09 20:14:58   | 03/12/09 15:14:58   | 1 | 26 | 44 |
| 0358 | 03/13/09 02:33:32   | 03/12/09 21:33:32   | 3 | 27 | 44 |
| 0359 | 03/13/09 08:33:48   | 03/13/09 03:33:48   | 1 | 27 | 44 |
| 0360 | 03/16/09 08:57:43   | 03/16/09 03:57:43   | 1 | 23 | 44 |
| 0361 | 03/16/09 09:15:22   | 03/16/09 04:15:22   | 2 | 27 | 44 |
| 0362 | 03/16/09 09:54:43   | 03/16/09 04:54:43   | 1 | 27 | 44 |
| 0363 | 03/16/09 18:37:15   | 03/16/09 13:37:15   | 2 | 28 | 44 |
| 0364 | 03/17/09 08:51:40   | 03/17/09 03:51:40   | 1 | 25 | 44 |
| 0365 | 03/24/09 15:38:59   | 03/24/09 10:38:59   | 2 | 31 | 44 |
| 0366 | 03/24/09 19:02:56   | 03/24/09 14:02:56   | 1 | 31 | 43 |
| 0367 | 04/03/09 09:00:05   | 04/03/09 04:00:05   | 1 | 29 | 43 |
| 0368 | 04/03/09 14:01:55   | 04/03/09 09:01:55   | 1 | 28 | 43 |
| 0369 | 04/03/09 14:06:39   | 04/03/09 09:06:39   | 1 | 30 | 43 |
| 0370 | 04/04/09 08:52:18   | 04/04/09 03:52:18   | 1 | 24 | 43 |
| 0371 | 04/05/09 08:38:07   | 04/05/09 03:38:07   | 1 | 27 | 43 |
| 0372 | 04/06/09 09:48:41   | 04/06/09 04:48:41   | 5 | 27 | 43 |
| 0373 | 04/16/09 19:59:12   | 04/16/09 14:59:12   | 5 | 29 | 42 |
| 0374 | 04/17/09 20:58:47   | 04/17/09 15:58:47   | 1 | 25 | 42 |

Port Allen0180

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 04/17/09 20:59:06 | 04/17/09 15:59:06 | 1 | 24 | 42 |
| 0376 | 04/17/09 20:59:33 | 04/17/09 15:59:33 | 8 | 26 | 42 |
| 0377 | 04/22/09 09:52:12 | 04/22/09 04:52:12 | 1 | 25 | 41 |
| 0378 | 04/23/09 17:00:04 | 04/23/09 12:00:04 | 1 | 31 | 41 |
| 0379 | | Invalid Date/Time | | | |

End of Report.

about:blank

1/17/2014

Port Allen0181

### *Mark Candies*
### *Expert Witness Services*
5 Edgewood Drive, Destrehan, La. 70047
504-329-9427

03-05-2015

**CASE:** Tracey Lewis, in her capacity as Natural Tutrix and on behalf of her minor child, E.E. (Heir to Ervin Edwards) vs. Sheriff Mike Cazes, et al

I have reviewed the following information regarding this case:

- Port Allen Police Department Report 13-002235 by Officer Dustin McMullan

- Port Allen Police Department Use of Force Report by Officer Dustin McMullan

- Port Allen Police Department Response to Aggression Report by Officer Dustin McMullan

- Port Allen Police Department Supplemental Report by Officer Dustin McMullan

- Port Allen Police Department incident report by Officer Casey Williams

- Port Allen Police Department Disciplinary Code - Order #12

- Port Allen Police Department Use of Force General Order #120

- Port Allen Police Department Firearms General Order #121

- Port Allen Police Department Non-Lethal Force General Order #125

- Port Allen Police Department Standard Operating Procedure Conducted Energy Device (CED)

- TASER Firing Event Log for TASER X-26 serial # X00-232544, issued to Officer Dustin McMullan

- Port Allen Police Department Training Records for Officer Dustin McMullan

- 1 -



- DVDs (5) Interviews of Officer Dustin McMullan, Officer Casey Williams, Officer William Alexander, Officer Corey Hicks, and Nurse Leah Granier

- DVDs (3) of surveillance cameras of WBPSO Jail Isolation hallway, Sally Port / Isolation Hallway / Isolation Cell, Booking / Isolation Cell

- W.B.R. Parish Coroner's Office Autopsy Report for Mr. Ervin Edwards

- W.B.R. Parish S.O. Incident report #13-110287 by Dy. Randy Austin

- W.B.R. Parish S.O. supplemental report by Sgt. Carl Jarrett

- W.B.R. Parish S.O. Evidence Log Sheet

- W.B.R. Parish S.O. Use of Force Worksheet by Dy. Randy Austin

- Criminal History Record of Mr. Ervin Edwards

- W.B.R. Parish S.O. Arrestee Information Sheet

- W.B.R. Parish S.O. supplemental reports written by
  - Maj. Andrew LeBlanc
  - Det. Richard Barnett
  - Dy. Ben Arceneaux
  - Det. Thomas Schiro

- Report of Mr. W. Lloyd Grafton, expert for the Plaintiff

My evaluation and remarks regarding this case are based on the above listed information, in additional to my twenty-eight (28) years of law enforcement field experience, and twenty (20) years as a law enforcement instructor, having taught local, state, and federal law enforcement officers in addition to U.S. Military personnel throughout the United States. I am also basing my evaluation and opinions on my certifications as a Level I Master Instructor for the Louisiana Peace Officers Standards and Training (P.O.S.T.) Council, Master Instructor for TASER International, Senior Defensive Tactics and Baton Instructor for the Safariland Training Group (Monadnock Lifetime Products), P.P.C.T. Defensive Tactics Instructor, and Instructor-Trainer in Police Use of Force.

I will be referring to various resources throughout my report such as the Louisiana Code of Criminal Procedure, Louisiana Law Enforcement Handbook, Federal Law Enforcement Training Center Legal Division Reference Book, TASER International Training and Operating Guidelines; Version 19, P.P.C.T. Defensive Tactics Manual, Louisiana P.O.S.T. Guidelines, and references from various related texts and periodicals.

- 2 -

I.

After reviewing all of the information and material provided to me regarding this matter, Mr. Ervin Edwards' death, though tragic and unexpected, was not the result of any misconduct, act of malice, or negligence on the part of Officer Dustin McMullan, Officer Casey Williams, or the Port Allen Police Department. The factual evidence clearly shows these officers acted reasonably in direct response to Mr. Edwards' willful and intentional acts of defiance, physical aggression, and deliberate resistance.

It should be noted that Mr. Edwards' behavior was a direct violation of the *Louisiana Code of Criminal Procedure Article 220: Submission to arrest: use of force;* which states, *"A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."*

My opinions and the factual basis for each are listed on the following pages of this report.

## Opinion One

Officer McMullan had a justifiable reason to become involved in this incident. He responded to a call for assistance made by deputies of the West Baton Rouge Parish Sheriff's Office. Once on scene, and after Mr. Edwards was initially restrained, McMullan requested Officer Williams come to the scene to assist in the transport of Mr. Edwards to the West Baton Rouge Parish Jail. The officers continued to render assistance throughout the incident because it was apparent their help was needed and welcomed. At no time did any of the West Baton Rouge Parish deputies advise them to stop assisting or make any attempt to stop Officers McMullan and Williams from providing assistance.

## Factual Basis

*The Louisiana Code of Criminal Procedure, Article 219 states, "A peace officer making a lawful arrest may call upon as many persons as he considers necessary to aid him in making the arrest."*

Providing assistance to another law enforcement officer or agency is a common and accepted practice carried out every day across the nation. Rendering assistance, or what is commonly referred to as "back-up" is done in the interest of officer safety and the well being of both the subject and the general public. There is no law or procedure mandating a formal request be made between law enforcement agencies to initiate or terminate such assistance.

- 3 -

**Opinion Two**

Officer McMullan did not violate any policy, procedure, or law when he carried his department issued TASER into the West Baton Rouge Parish Jail.

**Factual Basis**

There is no policy or procedure of the Port Allen Police Department that I have found which states officers are prohibited from bringing TASERS into a correctional facility. These types of restrictions and policies are incumbent upon the correctional facility, not the agencies bringing in arrests. If a policy or procedure exists preventing TASERS from being introduced into the West Baton Rouge Parish Jail, it would be published and enforced by deputies of the West Baton Rouge Parish Sheriff's Office.

**The Port Allen Police Department Standard Operating Procedure Conducted Energy Device (CED) states on page 6:**
> *Equipment Care and Maintenance: Only CEDs and CED cartridges issued by the Port Allen City Police Department will be used by Port Allen Police Officers.*
>
> *\*Officers issued CEDs will regard them as firearms and secure them in same manner as a firearm at all times.*

This refers to safety considerations and weapons handling fundamentals such as always point your weapon in a safe direction, keep your finger off of the trigger until you are ready to fire, etc. In this respect, if it is required by a specific facility that a TASER be secured, then the officer would secure the TASER in the same manner as he would secure his firearm, such as in a locked security box, or in the locked trunk of the officer's vehicle. Officer McMullan carried his TASER and cartridges in accordance with standard TASER training guidelines and Port Allen Police Department policy by having it secured in an approved issued TASER holster.

**Opinion Three**

The police reports of this incident describe Mr. Edwards' actions as physically aggressive and resistive. These behaviors were evident at various points during the incident in the videos I viewed from the West Baton Rouge Parish Jail.

An officer's use of force is based on the standard of law known as "objective reasonableness." The amount of force used is dependent upon the totality of the circumstances that existed at that time. Conversely, the use of a "force

continuum" is generally not procedural, though it is often mistaken to be. A force continuum is simply a tangible visual aid used to explain an intangible concept (objective reasonableness).

**Factual Basis**

Once Mr. Edwards is placed in the holding cell, he can be seen rising to his feet and standing under his own power, with balance, without assistance (18:24:05). When the officers open the cell door to move him to isolation cell #8, Mr. Edwards defiantly turns his back to the officers and sits on the bench inside of the cell, without being instructed to do so (18:25:28). At this time he then refuses to comply with numerous verbal commands to stand up and face away from officers. He responds only by howling like an animal (18:25:31). Officers are then forced to lift Mr. Edwards to his feet and begin to escort him out of the holding cell (18:25:33).

Louisiana law enforcement officers may receive defensive tactics training from a number of various defensive tactics training programs such as Pressure Point Control Tactics (PPCT), Monadnock Defensive Tactics System (MDTS), Vanguard Strategic Self-Defense and Grappling Techniques (SSGT), or the law enforcement version of Krav Maga, just to name a few. However, Louisiana peace officers are taught the application and use of force through the Integrated Force Management Course. This course is based on the legal standard of "objective reasonableness", as set forth by the **United States Supreme Court in Graham vs. Connor, (490 U.S. 386, 109 S. Ct. 1865 (1989)**, not a force continuum.

The force continuum listed in Port Allen Police Department General Order 125 serves as a guide for officers to use in determining the appropriate force to be used based on a subject's resistive behavior(s). This continuum describes several categories of subject resistance, and Mr. Edwards behavior at this point, would be classified as passive resistance.

> **Passive Resistance**
> **Passive physical actions such as going limp, refusing to place hands in a position to be handcuffed or what is commonly considered to be demonstrator resistance**

Port Allen Police Department General Order 125 also details several levels of officer control. As illustrated in the force continuum, the suggested level of officer control for passive resistance would be soft empty hand controls.

- 5 -

*Soft Empty Hand Control*
*Empty hand control techniques which do not have a probability of*
*injury (i.e. – transport wrist locks, pressure points or simple strength*
*techniques)*

Officer McMullan's response to Mr. Edwards' behavior at this point this was to use a combination of verbal commands and to grasp him under the arm and by the wrist (soft empty hand controls) to lift Mr. Edwards onto his feet and escort him to the isolation cell.

Officers McMullan and Williams did not use any other level of control or force at this point in the incident. This response to Mr. Edwards' defiant behavior was reasonable pursuant to the circumstances that existed at the time. The officers' actions were also necessary as a result of Mr. Edwards' voluntary resistance, and subsequently acceptable according to Port Allen Police Department procedure and applicable state and federal laws.


**Opinion Four**

The actions of officers McMullan and Williams during the movement of Mr. Edwards from holding cell #2 to isolation cell #8 were necessary, prudent, and reasonable.


**Factual Basis**

As Mr. Edwards is being escorted to isolation cell #8, he can be seen falling to the floor in a limp manner. This was a deliberate act of defiance, not one of unconsciousness or collapse. In the video Mr. Edwards can be seen purposefully bringing both of his feet together just before he goes to the floor. This is an intentional act to prevent the knees from completely flexing as he falls, thus preventing the knees from incurring serious pain or injury as he impacts the floor. At the same point of the video (18:26:02), Mr. Edwards is seen intentionally turning his head just before he begins to fall. This is an attempt to prevent his face from impacting the floor when he goes down.

Officer McMullan notes in his statement that after falling to the floor, Mr. Edwards was continually cursing and threatening the officers. A person suffering sudden collapse or unconsciousness would not be able to speak coherently, or maneuver their body in such a purposeful fashion. They would fall helplessly to the floor in an awkward manner.

The officers then elected to slide Mr. Edwards into the isolation cell rather than attempting to lift him. Mr. Edwards was intentionally being resistive and defiant

- 6 -

at this point. In consideration of his stature, 5'09" and well over 350 pounds, it would not be safe or reasonable for the officers to attempt to lift him. A safer and more reasonable alternative was to slide him on the smooth tile floor and place him into the isolation cell in as expeditious a manner as possible. This action reduced the potential for injury to Mr. Edwards and the officers that could have resulted from a failed attempt to lift him. By placing him inside of the isolation cell in an expeditious manner, the officers insured the safety of other inmates and staff members, as well as the security of the facility.

**Opinion Five**

Officer McMullan's decision to expose Mr. Edwards to a five (5) second drive-stun technique from his TASER CED was objectively reasonable, in accordance with Port Allen Police Department policy, TASER International Training Guidelines, and was acceptable under state and federal law.

**Factual Basis**

Mr. Edwards was placed in isolation cell #8 in a prone position and was verbally advised by officers not to resist because they were going to remove his restraints (18:26:20). Within one (1) minute, Officer McMullan was able to remove the handcuffs from Mr. Edwards' wrists despite his continued physical resistance (18:27:17). During this time frame Mr. Edwards refused to comply with officers' commands to stop resisting and attempted to roll onto his side, maneuver his hands under his torso in an obvious attempt to stand up, and tried to kick officers while they attempted to secure him for their safety as well as his own.

As another officer attempted to remove the zip-ties from Mr. Edwards' ankles by using a knife, which was the only cutting instrument readily available, Officer McMullan verbally advised Mr. Edwards to calm down so that no one would get injured. Mr. Edwards remained defiant and again aggressively resisted. Officer McMullan then drew his TASER (18:27:51), removed the cartridge, and placed it against Mr. Edwards' body while giving him numerous verbal commands to stop resisting or he would be tased. Officer McMullan fired his TASER when Mr. Edwards refused to comply subsequently exposing Mr. Edwards to one (1) five second drive stun, which had no visible effect nor did it alter Mr. Edwards' behavior.

My opinion is that Officer McMullan's actions here are indicative of a well-trained officer with a keen sense of situational awareness and an ability to function in stressful conditions.

- 7 -

Officer McMullan relied on his training as he evaluated the increasingly resistive encounter. He realized that officer presence, verbal commands, and soft empty hand controls, the first three levels of officer controls in his department's force continuum were unsuccessful.

Though he would have been justified in using the next control level, hard empty hand controls, which are intended to cause pain compliance, (techniques which have a propensity to cause bruising, swelling, and lacerations), Officer McMullan chose to use an intermediate weapon, his TASER. He chose this weapon because he could use it in drive-stun mode, which is strictly for pain compliance, knowing it had a far less chance of causing lasting injury. It also was a more appropriate weapon in drive-stun mode because it would limit the possibility of accidental exposure to the other officers. This was also a factor, in addition to the confined space of the isolation cell for not using OC spray in this situation. *(The use of a TASER in this situation is allowable according to Port Allen Police Department Standard Operating Procedure for CEDs; page 2.)*

Officer McMullan recognized that Mr. Edwards was no longer restrained with handcuffs, which allowed him to use his TASER. *(The exposing of a resistive subject that is not restrained to a TASER deployment is in accordance with Port Allen Police Department policy and TASER training guidelines.)*

Because Mr. Edwards' hands were now unrestrained, Officer McMullan realized Mr. Edwards' stature and obvious strength was now a threat to officer safety and had to be given due consideration. He maintained a good tactical position helping to restrict the movement of Mr. Edwards' legs while he surveyed Mr. Edwards' body to locate a safe target area (the gluteus maximus muscle). He applied a drive stun technique to this area to achieve pain compliance without the risk of subsequent injury. *(TASER International training guidelines, PPCT guidelines, and the MDTS Trauma Chart, all classify the gluteus maximus muscle as a primary target area, that provides a high possibility for pain compliance and a very low propensity for resultant trauma.)*

Officer McMullan discharged his TASER and exposed Mr. Edwards to one five-second, drive stun cycle. Upon observing the TASER had no effect, Officer McMullan decided not to expose Mr. Edwards to a second cycle. He kept his TASER in position on Mr. Edwards' body while giving additional verbal commands for Edwards to comply or he would be tased again. Officer McMullan's use of the TASER combined with verbal commands to persuade Mr. Edwards to comply was unsuccessful, but legitimate. Here again Officer McMullan's actions were again objectively reasonable considering the totality of the circumstances and were in accordance with his training. *(TASER's X-26 Drive-Stun Guidance checklist as illustrated in the TASER User Certification Course, Version 19;*

- 8 -

*Slides #200* ***DRIVE-STUN BACKUP***
> ***To use the drive stun without firing the probes, remove the live cartridge (M26/X26/X26P)***
> ***The drive stun will typically not cause NMI, only pain compliance***
> ***If not effective, evaluate the location of the drive stun, consider an additional cycle to a different pressure point or consider an alternative force option***

*Slide #201* ***DRIVE-STUN BACKUP***
> ***Do not hold on to a live cartridge while applying a drive stun (M26/X26/X26P)***
> ***If cartridge gets within approximately 2 inches of the CEW, it may deploy***

*Slide #202.* ***DRIVE-STUN MODE***
> ***For maximum effectiveness, drive the CEW into certain pressure points***
> ***Use care when applying the drive stun to the neck or groin***
> ***Stay away from the trachea, the back of the neck and the genitals)***

## VI.    Opinion Six

Officer McMullan's use of his TASER X-26 CED in Drive-stun mode, discharging one (1) five second cycle was in direct compliance with the TASER User Certification Program, Port Allen Police Department Policy and Procedure, and satisfied the legal standard of objective reasonableness as it pertains to police use of force.

### Factual Basis

Mr. Edwards was placed into isolation cell #8 in a prone position on his stomach to allow the officers the safest opportunity to remove his restraints without causing injury to him and to prevent him from injuring the officers (18:25:12). Mr. Edwards' aggressive behavior and physical resistance during the next two (2) minutes clearly indicate his purposeful intentions to free himself from the officers' control, and a willingness to injure them in the process.

The mere fact that Mr. Edwards' physical resistance required multiple officers to control him while attempts were being made to remove the restraints is evident of the potential for injury that existed to the officers. That risk of injury greatly

increased as the handcuffs were removed.  The officers were forced to use additional physical force to maintain control of Mr. Edwards while attempts were made to remove the leg restraints.  This exposed both the officers and Mr. Edwards to an increased potential of receiving bodily injury.

Officer McMullan recognized this as the officers continued to struggle to maintain control of Mr. Edwards.  This is when Officer McMullan decided to use his TASER in drive-stun mode to inflict pain compliance upon Mr. Edwards.

The following sequence of events are listed in a timeline to illustrate the progression of the incident, the process used by Officer McMullan to apply force, and the legitimate outcome of that force application.

18:26:12    Mr. Edwards is placed into isolation cell #8 in prone position on his stomach, a position commonly used by law enforcement officers to secure resistive and physically aggressive subjects.

18:27:17    Mr. Edwards is un-cuffed (both wrists) by Officer McMullan.

18:27:51    Officer McMullan draws his TASER X-26 from his holster and removes the cartridge, handing it to another officer.

*(A proper technique as instructed via the TASER User Certification Program, Version 19; slides #200 & #201, as cited in my previous opinion.)*

18:27:53    Officer McMullan can be clearly seen with his trigger finger "indexed" along the side of his CEW.

*("Indexing" is a technique taught to police officers both in TASER and firearms training.  This is the practice of intentionally placing the trigger (index) finger of the shooting hand outside of the trigger guard and alongside of the weapon so as to prevent it from depressing the trigger unintentionally.)*

18:27:56    Officer McMullan is seen surveying Mr. Edwards' body, then places his TASER directly on Mr. Edwards' right gluteus maximus muscle and leaves it in that position for several seconds as he issues verbal warnings to Mr. Edwards to stop resisting or he will be tased.

**(The surveying of Mr. Edwards' body was a proper technique and prudent action as taught in the TASER User Certification Program, Version 19.**

*Slide #138    Targeting*
*Avoid intentionally targeting the CEW on sensitive areas of the body such as the head, throat, breast, chest or area of the*

- 10 -

heart, genitals, or known pre-existing injury areas without
legal justification.

The preferred target areas are below the neck area for back
shots and the lower center mass (below chest or heart
area) for front shots
Avoid sensitive areas

Slide #140   Preferred Target Zone Areas Rear
Below neck (blue zone)
Large muscles
Avoid head

The back is always the preferred target area when reasonably
practicable under the totality of circumstances of the
incident.

Slide #183   Selective Targeting
The CEW may be a good option for enclosed environments
and close quarters such as houses, courts, jail cells,
emergency rooms, crowd control, etc.
Target specific

Slide #155   Tactical Considerations
If practical, attempt to: gain compliance using verbal
commands; use negotiation or commands before moving
to CEW
Verbal commands, display of TASER CEW, turning on the
LASER, or arc display may gain compliance)

NOTE:  At this time Officer McMullan's trigger finger is still indexed alongside of
the weapon.

Slide #71    TASER User Certification Program; Version 19
Single trigger pull and release discharges an electrical charge
for a 5-second cycle
Shift the safety switch down (SAFE) to stop a discharge (e.g.,
if accidentally discharged)
Holding the trigger continuously beyond the 5-second cycle
will continue the electrical discharge until the trigger is
released.  (The discharge will cease once the trigger is
released after the initial 5-second cycle.)

18:28:10    Mr. Edwards attempts to kick officers as the leg restraints are being
removed.  Officer McMullan deploys a 5 second drive-stun to Mr.
Edwards at this point in direct response to Edwards' physically
aggressive behavior.  Mr. Edwards can be seen lying motionless for

a period of approximately five (5) to six (6) seconds during the exposure, then he attempts to kick the officers as they try to remove the leg restraints. Officer McMullan observes no change in Mr. Edwards' behavior, and decides not to expose him to any subsequent discharges.

**(Officer McMullan's actions here are in direct compliance with use of force training provided in the TASER User Certification Program, Version 19;**

Slide #55    *Beaver v. City of Federal Way*
*The use of a CEW involves the application of force.*
*Each use of force [including each CEW cycle or 5 seconds of discharge] on a person that is a 4th Amendment seizure is the application of force and must be objectively reasonable.*
*Each additional CEW [5 seconds of] application involves an additional use of force.*
*This is true of any use of force.*

Slide #56    *Beaver v. City of Federal Way*
*Multiple CEW applications [each 5 seconds of discharge] cannot be justified solely on the grounds that a suspect fails to comply with a command, absent other indications that the suspect is an immediate threat or about to flee [from a serious crime].*
*This is particularly true when more than one officer is present to assist in controlling a situation.*

Slide #57    *Beaver v. City of Federal Way*
*Any decision to apply multiple CEW [5 second] applications must take into consideration whether a suspect is capable of complying with officers' commands.*
*This would apply to whether a suspect is capable of complying: physically, emotionally, language barrier, mental condition, etc.*

Slide #58    *Graham v. Connor Factors as Risk Prioritized Ranked by Chew v. Gates*
*Immediate threat to safety of officers/others*
*Actively resisting*
*Circumstances tense, uncertain, rapidly evolving ("pace" of events)*
*Severity of the crime at issue*
*Attempting to evade seizure by flight)*

Officer McMullan in my opinion perceived Mr. Edwards' actions as active resistance, which if allowed to continue, would result in injury to himself, other

- 12 -

officers, or Mr. Edwards, and subsequently jeopardize the safety of all persons involved. *Officer McMullan's perception of the incident at this point is in direct compliance with the Graham vs. Connor factors as Risk Prioritized Ranked by Chew vs. Gates as illustrated above in slide #58.*

18:28:22     As Mr. Edwards continues to resist, his movements force Officer McMullan to reposition his TASER, with his trigger finger again indexed, against Mr. Edwards' body. Mr. Edwards continues to resist as Officer McMullan repeatedly issues more verbal warnings to comply and stop resisting or he will be tased again. This is another example of Officer McMullan performing exactly as he was trained to do in this type of situation. Officer McMullan recognized the TASER had little or no effect in changing Mr. Edwards' behavior, and believed a second or subsequent exposure would have the same result. Subsequently, he elected to leave his CEW in contact with Mr. Edwards' body while giving verbal warnings attempting to persuade Mr. Edwards to comply.

*(Officer McMullan's actions here are in direct compliance with the TASER User Certification Program, Version 19;*

*Slide #164    Contingencies*
*CEW may have limited or no effect*
*No weapon system will operate or be effective all of the time*
*A CEW or cartridge may not fire or be effective*
*Be prepared to transition to other force options)*

18:28:58     The leg restraints are completely removed from Mr. Edwards.

18:29:00     Mr. Edwards is seen moving his left leg and does not appear to be in distress as the officers exit isolation cell #8.

## VII.    Opinion 7.

There is no doubt that Officer McMullan discharged his TASER X-26 in Drive-Stun mode for one (1) single cycle that exposed Mr. Edwards to a total duration of five (5) seconds of energy.

## Factual Basis

As a Master Instructor for TASER International, part of my certification process is to interpret TASER Event (Firing) Logs for TASER Conducted Electrical Weapons (CEWs).

- 13 -

I have closely examined the TASER Event Log for the incident in question and have no reason to believe it is not genuine. These logs are generated from a secure recording system located within the sealed processor of TASER CEWs. The report is uploaded to a computer program specifically designed to produce the Event log in a "read only" PDF format. There is no possible way for this information to be edited, revised, altered, or deleted.

The TASER Event Log I reviewed was printed on 01-17-2014, and contained firing data for TASER CEW serial number X00-232544, which was the TASER CEW used by Officer Dustin McMullan on 11-26-2013.

The report was fourteen (14) pages in length, with the incident in question appearing on page five (5), firing event # 0111. Firing events 0112 and 0113 were noted to be an automated time adjustments when the TASER CEW was uploaded. The following 264 firing events were noted to be previous dates than firing events 0001 through 0111. This indicates the memory bank of this TASER CEW had been filled to capacity and the internal recording unit began to re-write the newest data over the oldest records saved in the data bank.

With regards to firing event 0111, the local date and time is listed as 11-26-2013 at 18:46:12. This time is approximately twenty (20) minutes later than the time shown on the videos from the West Baton Rouge Parish Jail. This is not an unusual occurrence considering the following factors:

1) The internal clock of the TASER CEW was never synchronized to the timer used by the video system at the jail.

2) During the upload process on 01-17-2014, the internal clock of this TASER CEW was adjusted to the clock on the computer to which it was uploading, a designed process. That time adjustment was seven (7) minutes and 30 seconds. This indicates the time of the discharge on 11-26-2013 would have been approximately 18:39:42

3) There is an anticipated time drift with TASER CEWs over time that can range from one (1) to ten (10) minutes, depending upon environmental conditions, the condition of the unit itself, and other external factors.

Based upon these factors, I am confident that firing sequence 0111 of this report is the incident in question involving Officer McMullan and Mr. Edwards.

That being said, the duration reading for this firing sequence is five (5). This indicates a five (5) second discharge or cycle. The report shows no other firing cycle on this date, which indicates there was only one discharge of this TASER CEW on 11-26-2013 and it was for a five (5) second duration. This five (5) second exposure as well as Officer's McMullan's actions are objectively

reasonable and in agreement with current national standards.  *(TASER User Certification Program, Version 19 Guidelines AND the Police Executive Research Forum Guideline 21 as of March 2011:*
*"Personnel should use [a CEW] for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary."*

*"Personnel should consider that exposure to the [CEW] for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury."*

*"Any subsequent [CEW] applications [beyond 15 seconds] should be independently justifiable, and the risks should be weighed against other force options.")*

Based upon my practical experience and training as a TASER Master Instructor, I am confident that this report is correct in all of its information and therefore confirms and corroborates Officer McMullan's statement and incident report.


**II.**

It is my intention to refer to the sources and items identified in this report, in addition to any that may be produced during on-going discovery in this case, to support my evaluations and opinions.


**III.**

My qualifications and experience, in addition to my fee schedule have been attached to this report in Appendix "A".


**IV.**

As new and additional information is provided to me for review regarding this matter, I reserve the right to modify, change, or supplement my evaluations and/or opinions.

Mark T. Candies



USDC – Middle District of LA
Tracey Lewis v. Sheriff Mike Cazes, et al
CA No. 13-777-JWD-SCR

May 1, 2015

Exhibit K to the Port Allen City Defendants
Motion for Summary Judgment
Doc. _____



EXHIBIT

K

ALL-STATE LEGAL®